UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

TRAVELERS CASUALTY & SURETY
COMPANY OF AMERICA, a Connecticut                    CIVIL ACTION NO.: 1:03cv762Ro
corporation,

       Plaintiff,

v.

J. L. HOLLOWAY; EMILE DUMESNIL;
CHARLES DECUIR; JOHN ALFORD;
RICHARD T. MCCREARY; RICK REES;
JOHN DANE, III; ALAN A. BAKER; T.
JAY COLLINS; JEROME L. GOLDMAN;
GARY KOTT; RAYMOND E. MABUS;
ANGUS R. COOPER, II; BARRY J. GALT;
KENNETH W. LEWIS; and ERNST &
YOUNG, L.L.P.

       Defendants.
_____/

**Memorandum in Support of Plaintiff's Motion**
**To Exclude Expert Testimony– F. Tim Pease**

      **I. Introduction**

     Plaintiff, Travelers Casualty and Surety Company of America ("Travelers"), respectfully

submits this memorandum in support of its motion to exclude expert testimony from F. Tim Pease

("Pease"), one of four experts whose opinions Defendant, Ernst & Young, L.L.P., ("E&Y") proposes

to offer at trial.  One of the key issues in this case is whether E&Y was negligent in conducting the

audit of the December 31, 1999 financial statements included by the failed Friede Goldman Halter

("FGH") in its 1999 form 10-K (the "1999 10-K").  Of particular significance is E&Y's audit of the

$60 million estimate of losses included in the 1999 10-K for FGH's construction of the Petrodrill

drilling rig project.   Among other things, E&Y proposes to have Mr. Pease testify that FGH's

"process for preparing" the $60 million loss estimate, as reflected in the March 21, 2000 estimates at completion ("3-21-00 EACs") prepared by FGH, was "appropriate and reasonable," and that, the cost estimates in the 3-21-00 EACs were, themselves, "appropriate and reasonable."

The financial statements included in the 1999 10-K, which were audited by E&Y, contained a reserve for losses – the amount that FGH projected that it would lose – on certain fixed-price construction contracts, including contracts for the construction of two offshore drilling rigs known as the "Petrodrill project," or "Petrodrill." The 3-21-00 EACs were provided to E&Y by FGH in connection with the 1999 audit. The EACs contain three principal components: (1) labor costs; (2) material costs, including sub-contract costs; and, (3) contract revenues. The labor and material costs components of the EACs consist of costs to date and estimated remaining costs to complete. In order to compute labor costs to complete, the EACs contain an estimate of the number of labor hours necessary to complete the project and then multiply the estimated hours by a labor rate.

Travelers respectfully submits that the Court should exclude Mr. Pease's opinions and conclusions. As demonstrated below, although Mr. Pease appears to be quite qualified to opine with respect to drilling rig design – a matter that is not at issue in this case – he is not qualified to testify with respect to the preparation of construction cost estimates by a shipyard such as the 3-21-00 EACs prepared by FGH. More importantly, Mr. Pease has simply assumed the existence of critical facts necessary to support his conclusions. His conclusions are supported by nothing more than subjective belief or unsupported speculation regarding facts that Pease has assumed would have or must have existed. The assumed facts are not supported by the evidence. Further, Pease's assumptions and speculation are not based on a valid or testable methodology. Accordingly, the Court should exclude the proffered testimony by Pease.

## II.  Standard for Motion to Exclude Expert Testimony

Federal Rule of Evidence 702 provides as follows concerning the admissibility of testimony

of an expert witness:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. As explained by this Court in *Kemp v. Biolab, Inc.*, 2005 WL 1595669,(S.D.

Miss. 2005):

> Rule 702 assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant.  *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5ᵗʰ Cir. 1999).  The Fifth Circuit has described this Court's gatekeeping function under Fed. R. Evid. 702 and *Daubert* as follows:...[T]he court must ensure the **expert uses reliable methods to reach his opinions**; and those opinions must be relevant to the facts of the case.  The Supreme Court listed several non-exclusive factors to guide courts in their screening function: whether the proposed evidence or theory 'can be (and has been) tested'; whether it 'has been subjected to peer review and publication'; whether it has been evaluated in the light of 'potential rate[s] of error'; and whether the theory has been accepted in the 'relevant scientific community'.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579...(1993).  The *Daubert* factors remain relevant to the determination of expert testimony under Rule 702, as amended...The 2000 amendments to Rule 702 also reflect the Supreme Court's determination that the reliability analysis must remain flexible: not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant.  *Kumho Tire Co. v Carmichael*, 526 U.S. 137, 151...(1999)...**The Court may also consider other factors, if relevant, such as '[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion,' and '[w]hether the expert has adequately accounted**

3

for obvious alternative explanations.'

*Kemp v. Biolab, Inc.*, at *4 (emphasis added).

### III.    Pease is Not Qualified to Give Expert Testimony as to the Appropriateness or Reasonableness of the 3-21-00 EACs

Mr. Pease has had a long and apparently distinguished career as an engineer and designer of oil drilling rigs.  In 1962, he joined The Offshore Company, where he remained until his retirement in 1986.  Pease's employer was an owner and designer of oil drilling rigs.  Throughout his tenure, The Offshore Company contracted with various shipyards that would agree to build oil rigs according to specifications provided by the company.  Pease was responsible for the design of some of the rigs that his employer had built.  He spent time working with shipyards to ensure that the rigs being built for his employer were properly constructed.  Pease prepared some initial estimates of costs to construct rigs for his employer's use.  He also worked with shipyards to assist them in preparing estimates for the prices at which the shipyards would agree to contract with The Offshore Company.  Throughout his career, however, Pease was never employed by a shipyard, until after his retirement when he has been retained by a few shipyards as a consultant or expert witness.

Most of the drilling rig contracts that The Offshore Company entered into were, like the Petrodrill contracts, fixed-price contracts that required the contracting shipyard to build a rig for a fixed price according to specifications provided by the owner.  The only information that Pease has regarding the total cost to build a complete drilling rig, however, relates to the costs passed along to the owner or paid by the owner of the rig to the shipyard.[1]  Significantly, Pease has no information

---

[1]    Mr. Pease also has information and experience with regard to "owner furnished equipment," i.e., engines, thrusters and other equipment that The Offshore Company purchased from third parties for installation on the oil drilling rigs that it owned.  The costs related to owner furnished equipment are not an issue addressed by Mr. Pease's opinion in this case.

regarding the costs that any shipyard may have had to absorb for its own account due to an inability

to complete a drilling rig construction project for an amount equal to or less than the agreed-upon

fixed contract price.  Indeed,  Pease admitted that he was unable to state whether he was aware of

any rig building project took more than twice the originally estimated labor hours to complete

because he does not know the total number of labor hours expended by any shipyard.  As a result,

although there is evidence reflecting that FGH itself spent three times the number of labor hours it

originally estimated that it would require to complete another drilling rig it built contemporaneously

with Petrodrill, Pease had to admit that he had never seen information demonstrating that a shipyard

had expended a multiple of its originally estimated labor hours.[2]   The issue that Pease has been

asked  to provide expert  testimony about in this case is whether the EACs containing the costs

estimated by FGH to complete the Petrodrill project were "appropriate and reasonable."  Mr. Pease,

however, has never been privy to actual *shipyard* costs (as opposed to the costs passed along by

shipyards to owners) nor does he have information regarding the total number of labor hours (and

hence total costs) expended by any shipyard on a rig building project.  As a result, Pease does not

have the experience necessary to provide "expert" testimony as to whether the 3-21-00 EACs, which

purported to estimate FGH's total costs to complete the Petrodrill project, were "appropriate [or]

reasonable."  Because he is not qualified to give the testimony he has been asked to give by E&Y,

Pease should not be allowed to testify as an expert.

**IV.     Pease's Opinions Regarding the Appropriateness or Reasonableness of the 3-21-00
            EACs Are  Based Upon His Subjective Belief or Unsupported Speculation Regarding**

---

[2]     *See* Pease depo at 235-36 ("Q.  Now, have you ever seen a ship building or rig
building project that took more than twice the original number of hours estimated to complete?
A.   **Not knowing what shipyard man-hours are**, I can't say that  – I do suspect . . . this one
built in Spain . . . more than twice the man-hours estimated.") (emphasis added).

**Facts That Pease Has Assumed Would Have or Must Have Existed; His Opinions Are Not Based Upon a Valid or Testable Methodology.   Accordingly, the Proffered Opinions Are Not Admissible Expert Testimony**

**A.     Pease Does Not Know How the 3-21-00 EACs Were Prepared**

One of the principal opinions provided by Pease is his conclusion that FGH's "process for preparing" the 3-21-00 EACs was "appropriate and reasonable."  One of the most glaring problems with this opinion is that Pease does not actually know how the 3-21-00 EACs were prepared.  As mentioned, one of the principal components of the EACs was the labor costs.  The labor costs, in turn, were composed of labor hours multiplied by a labor rate.  The labor costs "at completion" of the project would consist of historical labor costs plus estimated labor hours going forward (until completion) multiplied by a labor rate.  FGH provided worksheets to E&Y that contain labor hours broken down into a few broad categories.  For example, with respect to one of the Petrodrill rigs known as B-103, FGH indicated that "EAC Labor Hours to Complete" would be 160,642 for "Structural Steel," 228,812 for "Electrical" and 141,168 for "Miscellaneous."  *See* Exhibit B-68 at EY99 001128 (Amethyst - Job B-103 Labor Hours - EAC Worksheet).

Although the FGH Worksheet used broad categories, Mr. Pease recognized that, in order to properly put together an estimate of labor hours, FGH would have needed a breakdown of labor hours by craft.  He testified:  "**I don't think they could put this together without some backup by craft**."  Pease depo at 219 (emphasis added).  He also admitted, however, that he has never seen a breakdown by craft dated as of March, 2000 when the 3-21-00 EACs were prepared.  His testimony on this point speaks volumes as to Pease's methodology:

> Q.  **Have you ever seen the backup by craft?**  A.  **I just assumed it was never produced**.   Q.    Why would you assume that, sir?
>  A.    Because it was not in any of the files  that I received.  There's

6

too many pieces of -- I mean when you make up these manning charts and  manning projections and all that, they have to have some basis. **This is just a summary thing.**    Q.    But you've never seen the backup support for this worksheet?    A.    Well, again, if I see a monthly plan  meeting it has all these curves in it, S curves --  Q. **Have you seen the monthly plan of S  curves, et cetera, as of March 21, 2000?**    A.   I can't recall.  **I can't say that I have.**   If they have one in May, they have one in March as  well.    Q.    Have you seen one in May?    A.    I think so.  I saw the one we were talking about.    Q.    And do you think those S curves are  sufficient to support the breakdown per craft of the  labor hours that are on this worksheet?  A.    I think they've developed curves and  man-hours to go ahead and there's some detail backup that says this is the number of man-hours we have to have to finish this job and **I think there must be some information to support these numbers found and I could be wrong**.    Q.    But you haven't seen it?    A.    I haven't seen it, no. . . .

Pease depo at 219-20 (emphasis added).  Again,  Pease opines that FGH's *process* for developing

the EACs was "appropriate and reasonable."  As the testimony quoted above demonstrates, however,

he also acknowledged that some backup, broken down by craft, would be necessary in order to

prepare the labor hours estimate in the EACs.  Finally, although he admits that he has never seen any

backup reflecting the necessary breakdown by craft, he "just assumed it was never produced."  In

addition, as demonstrated below, Pease expressly testified that he was not able to and was not

testifying about the reasonableness of the labor rates used by FGH to develop the 3-21-00 EACs.

**B.     Pease Does Not Know How The EAC Worksheet Was Prepared**

      1.     No basis for assuming "Miscellaneous" labor hours reasonable

As mentioned, the EAC Worksheet did have labor hours broken down into broad categories.

Among those broad categories was an entry of 141,168 "EAC Labor Hours to Complete" in a ctegory

titled: "Miscellaneous."   Although he admitted that he did not know how FGH computed the

141,168 "miscellaneous" hours, Pease nevertheless insisted that he could opine as to the

"reasonableness" of the number.  Pease testified as follows::

> Q.     All right.  Now, **how do you know whether   that miscellaneous 141,168 hours was reasonable**?  MR. GORSLINE: Object to the form.     A.  **I just have to say Bill Bingle** [the FGH project manager] **had a   reason to put that in probably as a contingency**.  But  I noticed the total is the same was what they started out using. . . . .  Q.   **Do you have any way for testing the reasonableness of the conclusion reached in this worksheet that there would be 141,168 hours, labor hours needed to complete the miscellaneous category**?        A.    In my opinion, it's purely speculation.  Bill Bingle put all this together and he had a number here that was  maybe  50,000 different, 100,000  different, Ron Schnoor put together his numbers in the Global picture, and I'll just go back and round off the numbers with your number.    Q.   That's your speculation?    A.  That's speculation.    Q.  My question is not whether there was a  distinction between Mr. Bingle and Mr. Schnoor.   My  question is, how do you know whether it was reasonable to estimate 141,168 hours to complete  miscellaneous category?          MR. GORSLINE:  Object to the form.     A. Again, **I took that as being a contingency number**, so.      Q. **How do you know** --     A.  **I don't know that**.  It seems they had a    basis for  assuming  they  needed  a  catch-all  category  called miscellaneous.     Q.   **Do you know what that basis was**?    A. **Bill Bingle's vast experience in preparing these kind of estimates**. Q.   Other than Bill Bingle's vast experience  in preparing these kinds of estimates, are you aware of any estimate that supports the 141,168 labor hours estimate for miscellaneous?  A.  No.  But **I'm sure Mr. Bingle, he sent out  a memo to, I think there's 15 people, he said, I want your input**.  I need all your help and I'm getting ready to put these numbers together, and so someone   probably said, I want some miscellaneous time or suggested. Q.    **But you have no basis. You're assuming  these things happened?**  A.   **I assume the guy knows what he's doing**.

Pease depo at 194-96 (emphasis added).  Once again, this testimony demonstrates that Pease merely

assumed the existence of facts that would support his conclusion that FGH's process for developing

the EACs was "appropriate and reasonable."

8

2.      No basis for assuming "Program Management" or "Program Support" labor
hours reasonable

The EAC Worksheet included several categories, including "Program Management"and

"Program Support," in which FGH estimated that no labor hours were to be necessary in order to

complete rig B-103 of the Petrodrill project.  When questioned as to the reasonableness of the

estimate of zero labor hours going forward for these categories, Mr. Pease first admitted that he

didn't know, "I really can't say specifically," what type of work would be included in these

categories.  *See* Pease depo at 211.  Despite this admission, Pease attempted to defend the

reasonableness of the zero labor hour estimate based upon his recurring assumption that FGH

prepared the EACs correctly.  Mr. Pease testified:

> Q.    Program management, zero, and program support is zero and
> engineering is 65,000.  All right.  Now, sir, did you have an
> understanding -- **do you have any basis for believing that the
> company reasonably estimated zero hours for program
> management and program support going forward from March
> 21, 2000,** other than your belief that Mr. Bingle would have done it
> right and whatever, do --   MR. GORSLINE:  Object to form   A.
> **I think Mr. Bingle would have -- knew  there was going to be
> another category or that it was subcontracts, I don't think he
> would have just said we don't need them.** Q.    But **other than
> your belief he wouldn't have done that, have you seen any
> evidence, any worksheets, any backup for that**? A.    **No,** sir.

Pease depo at 212-13 (emphasis added).

3.      No basis for assuming "Trials and Commissioning" labor hours reasonable

There has been substantial testimony and evidence in the case regarding an EAC that FGH

prepared in December, 1999.  At that time, FGH concluded that it would suffer a loss of  in excess

of $100 million over and above the Petrodrill contract price in order to complete the project.  Later,

FGH prepared the 3-21-00 EACs with the $60 million loss estimate.  E&Y contends that it did not

9

know that the $100 million loss estimate existed when it prepared the audit in connection with FGH's 1999 10-K. One of Pease's opinions is that the labor hour figures used by FGH in computing the December 1999, $100 million loss, estimate "were not as well prepared, accurate, reliable or reasonable as the manhour estimates" in the 3-21-00 EAC's. *See* Pease Report, at 1. In Table V of his Report, Pease compared the labor hours (or "manhours") in the two estimates. The December, 8, 1999 EAC estimated that FGH would need 45,000 labor hours for "Trials/Commissioning" in order to complete Petrodrill rig B-103. FGH eliminated that category altogether from the EAC Worksheet for the 3-21-00 EACs and, thus, effectively estimated zero labor hours in the "Trials/Commissioning" category. Pease explained that "Trials/Commissioning" relates to the testing done once a drilling rig is complete in order to ensure that it functions properly. *See* Pease depo at 205-06. Indeed, he explained that it is the "very last thing" done in a rig construction project. *Id.*

Pease attempted to defend the "reasonableness" of FGH's elimination of the 45,000 labor hours it had previously estimated for "Trials/Commissioning" as follows:

> Q. So let me ask you then, **the 45,000 hours that we've estimated in December 2000** was just a totally ridiculous numbers, is that what you're saying? MR. GORSLINE: Object to the form. A**. I would say Bill Bingle felt it was not necessary. Q. How do you know he felt it was not necessary? A. He would have written it down if he thought it was necessary.** Q. Okay. Other than your belief that Mr. Bingle would have written it down if he thought it was necessary, **do you have any basis for believing that an analysis was made and a decision was reached by the company saying, we will not need any labor hours for trial and commissioning**? MR. GORSLINE: Object to the form. A. They have -- like this big category, mating and launch, they may have figured there'd be some people left from that to spill over. Q. How many hours were estimated on March 21, for mating and launch? A. About 65,000. Q. No, on March 21, 2000. A. None. Q. There were no

labor hours from that  category that could spill over into trials and commissioning; right?  In March 21 there were no  extra hours in mating and launch that could be used for trials in commissioning, were there, sir?   A.  **All I could say with any degree of certainty is that I think Bill Bingle compiled this list of man-hours, he scrutinized each individual line item and for whatever reason, he decided,** for example, miscellaneous and paint, I need more man-hours than Foster Walker had.  Material handling,  I don't need as many as he had.  Quality control, I needed a few less.   . . .

Q.   **Other than your belief that Mr. Bingle would have acted in accordance with — would have acted competently and honestly, et cetera, have you ever seen any kind of calculation or any kind of backup for the decision to estimate zero hours for mating and launch and trials and commissioning March 21, 2000**? I'm talking about hard documents. A.   **I can't say I've ever seen a shipyard estimate for what they had to provide for trial and commissioning**.

Pease depo at 208-11 (emphasis added).  As this excerpt demonstrates, in the absence of any backup to support FGH's computations, Pease once again fell back on his assumption that FGH and its Petrodrill project manager, Mr. Bingle, in effect, acted "reasonably and properly," in an effort to support his conclusions that FGH acted "reasonably and properly."

        4.       No basis for assuming "Rework" labor hours reasonable

One of the major reasons that witnesses have given for the increases in the cost to complete the Petrodrill project over the original fixed-price contract amount of $168 million for both rigs ($84 million each rig) is problems relating to incomplete and inadequate engineering for the rigs. Witnesses have explained that, among other things, if a project goes forward with inadequate engineering, there is a likelihood that work will have to be redone.  The word "rework" is often used to describe work that must be redone.  FGH's EAC Worksheet estimated zero labor hours needed for "rework" in order to complete the Petrodrill project.   Even Pease was at a loss to attempt to justify the zero labor hours estimate for "rework" going forward.  He testified: " I would personally

question why there's not something going forward on the rework." *See* Pease depo at 218.  Despite

his questioning of the basis for estimating zero labor hours for "rework," Mr. Pease continued to

abide by his conclusions.

**C.      Pease Does Not Know How the Subcontract Estimates Were Prepared**

As mentioned, in addition to labor costs, the 3-21-00 EACs included amounts for estimated

material and subcontract costs.  In Table V of his Report, where Pease compared FGH's December

8, 1999 and 3-21-00 EAC labor hours, Pease also included a list of subcontract amounts which he

explained were essentially the same for both sets of EACs.  One of the subcontracts Pease looked

at was a $200,000 subcontract for Trials/Commissioning.  Pease attempted to defend the sufficiency

of the estimated $200,000 subcontract amount as follows:

> **Is it your  understanding that $200,000 is sufficient to cover the
> trials and commissioning test for a rig like the Petrodrill rig**?   A.
> **That's a lot of money.  It seems to me like it should be enough**.  Q.
> Have you ever seen a contract for -- let's not go over it because I
> know you have a lot of vast  experience, but **during the period
> around 1999 or 2000, are you aware of the market price for trials
> and -- for conducting trials and commissioning?**         MR.
> GORSLINE:  Object to the form.     A.     **I can't say that I
> specifically have a  number that I've seen somebody use**.  I mean,
> **I assume that this was a subcontract number for sea captains and
> people running ballast systems**, suppliers they  had to pay the
> people to run the machinery.  Q.    You've assumed that.  **Do you
> have any  evidence other than your assumption**?      A.   **No.**

Pease depo at 207-08 (emphasis added).  Pease's testimony in this regard again demonstrates that

he does not feel the need to provide any support for his conclusions.  Despite his admission that he

had only assumed that the subcontract covered sea captains, etc., and his admission that he was not

aware of "a  number " for similar subcontracts, he insisted that $200,000 was sufficient because:

"That's a lot of money.  It seems to me like it should be enough."

**D.     Pease Has No Basis For Supporting His Opinion That FGH's Increased Cost Estimate Subsequent To The 3-21-00 EACs Was Due to Costs That Were Not "Reasonably Foreseeable"**

1.     No basis for assuming material and subcontract increases were not reasonably foreseeable

When FGH prepared its financial statements for December, 2000, the loss estimate for Petrodrill was substantially greater than the $60 million loss included in the 3-21-00 EACs. According to Pease's calculations, the cost increase from the 3-21-00 EAC's to December, 2000 was approximately $43 million. *See* Pease Report, Table VII (fourth page).   The December, 2000, estimate was, therefore, essentially equal to the $100 million estimate in the December 8, 1999 EACs.  Notwithstanding, E&Y also proposes to have Pease opine that the increase in costs from the 3-21-00 EACs to the December, 2000 estimate was not "reasonably foreseeable."   In Table VI of his Report, Pease set out the material and subcontract increases between the 3-21-00 EACs and another set of EACs prepared in August, 2000.  According to Pease's Table VI, the total increase for both Petrodrill rigs was slightly in excess of $14 million ($ 8 million for rig B-103 and $6.3 million for rig B-104).  Pease attempted to justify  his conclusion that the amounts were not reasonably foreseeable, as follows:

> Q.  Okay.  And **what basis do you have, if any,  for stating that as of March 21, 2000, the company did  not  anticipate these additional costs**?  A.   Because I -- ***again, it's an assumption on my part*** **that these are small line items that they didn't anticipate, didn't foresee**, but they got into  the project further after May.  Q. You're talking about  table six; right?  A.   Yes.  Q.    **It says, engineering, $1,600,000?**   A.   Yes.    Q.   **You think that's a small item?     A.   I think it is, yes.**   Q.   And where it says, underwater gear, $1.8 million, you think that's a small item? **A.     I think it was one of those easy to miss is the thruster installation** and the thrusters that  they were --   Q.   You think they didn't think they would need thrusters?  A.   No, but **I think**

13

they underestimated what they thought it would take to put them in.   . . . . Q.   And my question to you is, what basis do  you have for stating that the company was not aware of that figure or could not have determined what that  amount was in March 21st, 2000?      A.   The basis is, again, **I think when they put  together the March 21 estimate, they tried to include everything and then these are a number of items they  missed**.      Q.   Okay.  **How do you know that they didn't  have this in their records** -- I'm sorry.  Let me back  up.  Is it consistent with your testimony that perhaps they had that number and they just didn't put  it in?  They had it somewhere in their records and  they didn't put it in?  MR. GORSLINE: Object to form.      A.      **Based on the fine screening  Bingle did in the assembling of these numbers, I don't think somebody had them hidden up his sleeve and then  produced them after March 21.** . . .      Q.   Other than your belief that Mr. Bingle would have been comprehensive in his view, **do you  know of any other basis for stating that the company did not know that it would need $1.8 million of  underwater gear in March of 2000?**      A.   Just based on my experience in working with shipyards and the people that put together cost  estimates and knowing the trauma they went through when they shut down this rig and got started again, **I believe that the people that prepared these March 21 estimates put everything they could  conceivably think of in this, _based on my historical experience with people in that position._**

Pease depo at 246-49 (emphasis added).  Once again, Pease attempted to rely on his assumptions.

This time, he assumed that $1.6 million was a "small item." He also assumed, again, that FGH "tried

to include everything and then these are a number of items they  missed."  Finally, he attempted to

support his conclusion in part "based on my historical experience with people in that position."  In

other words, Pease essentially attempts to support his conclusions on the basis of his assumption that

FGH employees would have acted like people Pease had worked with in the past.

Another amount that, according to Pease, helped to explain the (supposedly not-reasonably

foreseeable) increases from the 3-21-00 EACs to the December, 2000 EACs was $3,760,662 in

"Added cost from Mississippi Finesse Purchase Orders."  *See* Pease Report, Table VII (third page).

Pease attempted to explain why these costs were not included in the 3-21-00 EACs with another assumption. This time, he assumed that "this money hadn't been transferred from B-103 -- I mean 104 in Mississippi to B-104 in Mississippi. **It's obviously a screw-up.**" Pease depo at 253-54 (emphasis added). When it was suggested to Pease, consistent with the evidence in this case, that FGH had the "Finesse" accounting system "up and running" since before the 3-21-00 EACs were prepared, Pease admitted that he "cannot explain" why the $3,760,662 in costs maintained in the Finesse accounting system were not included in the 3-21-00 EACs. *See* Pease depo at 254.

      2.    No basis for assuming labor increases were not reasonably foreseeable

The other component of the $43 million difference between the 3-21-00 EACs and the December, 2000 EACs was approximately $17.9 million in labor increases that resulted from FGH having increased its "burdened labor rate." *See* Pease Report at 11. Pease states that the labor rates increased from $28.03 (rig B-103) and $25.57 (rig B-104)[3], respectively, in the 3-21-00 EACs to $31.26 (rig B-103) and $30.56 (rig B-104), respectively, in the December, 2000 EACs. *See* Pease Report, Table VII (fourth page). Initially, Pease himself admits that he cannot give an opinion as to the reasonableness of the labor rates used by FGH in the 3-21-00 EACs. *See* Pease depo at 203 ("Q. . . . Now, what's your basis or **do you believe that the rate used on the March 21, 2000, the labor rate of $26 is a reasonable rate**? A. **That's not something that I would be able to say it was or was not reasonable**. . . . Q. And you're not giving an opinion then as to whether that rate is reasonable, are you, sir? A. No.") (emphasis added); *see also* Pease Report at 13 ("I have not independently verified the reasonableness of the labor rates used in the 3-21-00 EACs").

---

[3]    The labor rate difference between the two Petrodrill rigs is explained at least in part by the fact that the B-104 rig was moved to a shipyard in Texas while the B-103 rig was being built in Mississippi.

Again, Pease admits that $17.9 million difference in labor costs between the 3-21-00 EACs and the December, 2000 EACs results entirely from a change in labor rates.  Further, Pease admits that he cannot testify as to the reasonableness of the labor rates used in the 3-21-00 EACs.  As a result,  Pease's effort to opine that the $17.9 million increase in labor cost estimates was "not reasonably foreseeable," is truly astounding.  Although he admits that he cannot possibly have a basis for doing so, Pease nevertheless purports to give an "expert" opinion on the foreseeability of the change in labor rates.

There is even more reason why Pease cannot be allowed to give this testimony.  The evidence in this case includes EACs for the Petrodrill project prepared by FGH's predecessor Halter Marine Group ("Halter"), one of the two companies that merged in November, 1999 to form FGH.  Halter prepared EACs in May, 1999.  Those EACs, like the 3-21-00 EACs, were provided to E&Y – this time in connection with the March, 1999 (fiscal year) audit of Halter.  The May, 1999 EAC for Petrodrill rig B-103 used a "production" labor rate of $28 and an "engineering" labor rate of $40. (Significantly, FGH's 1999 10-K reported that FGH's labor costs had "substantially" increased as a result of the November, 1999 merger.)  The May, 1999 labor rates, if combined into a single, blended (production plus engineering) labor rate would be at least as high (and probably higher, as the 3-21-00 EACs increased FGH's estimate of the amount of engineering labor that it needed substantially beyond the Halter May, 1999 EACs) as the December, 2000 EACs.  Not surprisingly, when asked how the Petrodrill labor rate could be above $30 in May, 1999 and December, 2000, but only $28 or $26 in the 3-21-00 EACs, Pease had no response.  *See* Pease depo at 254-55.

**E.    Pease Admits That He Has No Basis For Testing The 3-21-00 EACs**

As demonstrated above, instead of relying on any type of identifiable, testable, expert

16

methodology, Pease repeatedly assumed or speculated that FGH and its project manager, Mr. Bingle, had properly prepared various aspects of the 3-21-00 EACs. Those assumptions then became the "basis" for Pease's conclusions that the cost estimates in the 3-21-00 EACs were "appropriate and reasonable." Needless to say, this circular, self-serving reasoning cannot support legitimate expert testimony.[4] Pease himself essentially admits as much.

In the 3-21-00 EACs for rig B-103, FGH estimated that it would need approximately 1 million labor hours (1,039,200). When questioned about the estimated total labor hours, Pease admitted that he would have no basis for questioning an estimate of 1,300,000 or even 1,500,000 labor hours. Mr. Pease testified as follows:

> Q.   Let me ask you something, sir. This Exhibit B-68 [3-21-00 EACs] has a man-hours estimate to complete for rig B-103 of approximately 1,039,000 hours; right? A. Yes.   Q.   **If that document said 1,500,000 hours, do  you have any basis for believing that it would be  unreasonable?  If Mr. Bingle had written 1,500,000  hours or 1,300,000 hours on that EAC, do you have any  basis for stating either of those numbers were –** MR. GORSLINE: Object to the form.   A. **No, I couldn't. I'd have to believe the number of the people who put the number together with all he had available, he had the right number**. Q.   **So basically you believe that whatever -- Mr. Bingle would have put the right number?  A.   Yes.**   MR. GORSLINE: Object to the form.  Q.  **So if he put 1,300,000, you would believe that would be reasonable?  MR. GORSLINE: Object to the form.  A.   I wouldn't prepare to argue with it, no.**

Pease depo at 234-35 (emphasis added).

Mr. Pease's opinions as to the "reasonableness" of the 3-21-00 EAC cost estimates and his related opinions are nothing more than his speculative opinions based upon the wholesale

---

[4]     The undersigned repeat that they believe that Mr. Pease is quite well qualified to testify about drilling rig design. The record and his testimony makes clear, however, that he has no basis for providing the "expert" testimony that E&Y has proffered in this case.

assumption of any and all necessary underlying facts, despite the admitted absence of any evidentiary or other basis for the assumptions. This Court has held that this type of opinion testimony is not proper expert testimony. *Lott v. Rental Service Corporation*, 2006 WL 839558, *2 (S.D. Miss. 2006) ("Under the *Daubert* standard, speculative opinion testimony is not reliable opinion testimony"); *see* also, *Papadopulis v. Fred Meyer Stores, Inc.*, 2006 WL 1375074, *2 (W.D. Wash. 2006) ("In general, the expert's opinion must be based on principles, techniques, or theories that are generally accepted in his or her profession and must reflect something more than subjective belief and/or unsupported testimony").

Pease's testimony makes clear that his opinions are based almost entirely on nothing more than Pease's own assumptions and conclusions – regarding his belief that FGH and Mr. Bingle must have acted properly and in the manner in which Pease believes people who he dealt with during his own career acted. Nothing about Mr. Pease's Report or his testimony demonstrates that he used any methodology other than using his own assumptions to fill in any and all gaps in the evidence. In effect, Pease's methodology is to assume the truth of his own conclusions. As a matter of law, however, this type of "ipse dixit" (because I say so) testimony is not recognized by our courts. *See Kemp v. Biolab*, 2005 WL 1595669, *6 (S.D. Miss. 2005) ("There is simply too great an analytical gap between the data and the opinion proffered...nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert,") (quoting from *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Moreover, the entire premise of the proffered opinions, that Pease can determine the "reasonableness and appropriateness"of FGH's 3-21-00 EACs and their preparation, is legally suspect and improper. *See Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447

18

(9th Cir.1992)(reasonableness and foreseeability of plaintiff's reliance inappropriate subjects for expert testimony); *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir.1995)(improper to admit testimony of expert who opined on the reasonableness of officers' conduct under Fourth Amendment standards).   For this further reason, Pease's opinions should not be allowed.

In addition, Pease himself made clear that he is not qualified to testify (and, supposedly was not testifying) as to the reasonableness of the labor rates used in the 3-21-00 EACs.  The labor rates, however, are an integral component of the 3-21-00 EACs.  By his own admission, therefore, Pease is not qualified to testify as to the "reasonableness" of the 3-21-00 EACs.  Finally, as also discussed above, during his entire career, Pease has never been privy to information regarding the total costs incurred by a shipyard such as FGH (as opposed to costs passed along to rig owners) in connection with a fixed-price rig construction contract.   As a result, he is simply not qualified to testify as to the "reasonableness" of FGH's cost estimates. For this additional reason, his opinions and testimony must be rejected.  *See Lott v. Rental Service Corporation*, 2006 WL 839558, *2 (S.D. Miss. 2006) ("Applying the *Daubert* standard, the Fifth Circuit has instructed that '[a] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject'.", quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).

## Conclusion

For the foregoing reasons, and based upon the cited authorities, Plaintiff Travelers respectfully requests the entry of an order precluding the proffered opinions and testimony of Mr. F. Tim Pease.

Respectfully submitted,

Travelers Casualty and Surety Company
Of America, Plaintiff

19

RODRIGUEZ TRAMONT
GUERRA & NUÑEZ, P.A.


By:/s/ Frank R. Rodriguez_____
COUNSEL OF RECORD

William V. Westbrook, III (MS Bar 7119)
John Paul Barber (MS Bar 1983)
Bryant, Clark, Dukes, Blakeslee,
   Ramsay & Hammond, PLLC
2223 14th Street
P.O. Box 10
Gulfport, Mississippi 39502
Telephone: (228) 863-6101
Facsimile: (228) 868-9077

OF COUNSEL:
Andrew V. Tramont, Esq. (FL Bar 322830)
Frank R. Rodriguez, Esq. (FL Bar348988)
RODRIGUEZ TRAMONT
   GUERRA & NUÑEZ, P.A.
2100 Ponce De Leon Boulevard, PH II
Coral Gables, Florida 33134
Telephone: (305) 350-2300
Facsimile: (305) 350-2525
Attorneys for Plaintiff,
Travelers Casualty And
Surety Company of America

**Certificate of Service**

  I, Frank R. Rodriguez, attorney for Plaintiff, Travelers Casualty & Surety Co. of America,

do hereby certify that I have this date caused a true and correct copy of the foregoing to be served

upon counsel for Defendant as follows:

VIA U.S. MAIL:

Joseph B. Haynes, Esq.
Michael M. Raeber, Esq.
King & Spalding, LLP
1180 Peachtree Street, N.E.

Atlanta, GA 30309-3521

Cheri A. Grosvenor, Esq.
King & Spalding, LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309-3521

Lisa Wolfgast, Esq.
King & Spalding, LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309-3521

VIA E-MAIL:

Joseph B. Haynes, Esq. - jhaynes@kslaw.com
Michael M. Raeber, Esq. - mraeber@kslaw.com
Cheri A. Grosvenor, Esq. - cgrosvenor@kslaw.com
Lisa Wolfgast, Esq. - lwolfgast@kslaw.com

This 30th day of May, 2006.

/s/ Frank R. Rodriguez