**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | |
|---|---|
| **TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA, a Connecticut Corporation,** ) ) ) ) | |
| **v.** ) ) | |
| ) **CIVIL ACTION NO.** | |
| **J.L. HOLLOWAY; EMILE DUMESNIL; CHARLES DECUIR; JOHN ALFORD; RICHARD T. MCCREARY; RICK REES; JOHN DANE, III; ALAN A. BAKER; T. JAY COLLINS; JEROME L. GOLDMAN; GARY KOTT; RAYMOND E. MABUS; ANGUS R. COOPER, II; BARRY J. GALT; KENNETH W. LEWIS; and ERNST & YOUNG LLP** ) **1:03-cv-762-LG-JMR** ) ) ) ) ) ) ) ) ) ) | |

**ERNST & YOUNG LLP'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION
TO EXCLUDE EXPERT TESTIMONY AND REPORT OF F. TIM PEASE**

Defendant Ernst & Young LLP ("E&Y") submits this response in opposition to the Motion to Exclude Expert Testimony and Report of F. Tim Pease (the "Motion") submitted by Plaintiff Travelers Surety & Casualty Company of America ("Travelers").

**I.  INTRODUCTION**

The primary issues in this lawsuit are (1) whether Travelers reasonably relied on E&Y's audit opinion on Friede Goldman Halter's ("FGH") December 31, 1999 financial statements (the "Financial Statements") in issuing a bond nine months later, and (2) whether that alleged reliance or other reasons caused Travelers to issue the bond on which Travelers ultimately lost money. Assuming arguendo that Travelers can demonstrate both reasonable reliance and proximate

causation (which E&Y strongly disputes[1]), another primary issue will be whether E&Y was negligent in auditing the Financial Statements -- which Travelers does not deny include a provision for an estimated loss in the amount of $60 million on the Petrodrill semisubmersible drilling rig projects (the "Petrodrill Project").

The losses on the Petrodrill Project were just one part or aspect of the overall Financial Statements,[2] and the $60 million loss on those projects was derived from and based upon the so-called estimates-at-completion that FGH prepared on or about March 21, 2000 (the "3-21-00 EACs").[3] In its lawsuit, Travelers contends that the 3-21-00 EACs were false and misleading and that the $60 million estimated loss should have been higher. (Complaint ¶ 58.)

Whether E&Y was (or was not) negligent in its audit of the Financial Statements does not depend at all on whether the 3-21-00 EACs were (or were not) reasonable. Numerous courts have held that auditors are not "guarantors" of the numbers in the financial statements that they audit. *E.g.*, *In re Haw. Corp.*, 567 F. Supp. 609, 617 (D. Haw. 1983); *Aldrich v. N.Y. Stock Exch., Inc.*, 446 F. Supp. 348 (S.D.N.Y. 1977); *see also* Willis W. Hagen, II, *Certified Public Accountants' Liability for Malpractice: Effect of Compliance with GAAP and GAAS*, 13 J. Contemp. L. 65, 78 (1987) (good faith compliance with GAAP or GAAS generally satisfies duty of care).

---

[1] E&Y filed its Motion for Summary Judgment because the undisputed evidence in this case conclusively demonstrates as a matter of law that (1) Travelers did not reasonably rely on the Financial Statements, (2) other intervening causes preclude any alleged negligence of E&Y from being the proximate cause of Travelers' losses, and (3) E&Y was not negligent in failing to uncover alternative EACs that showed higher losses on the Petrodrill project.

[2] E&Y opined on the Financial Statements taken as a whole. E&Y never opined separately on the $60 million loss or on any aspect of the Petrodrill Project, nor did E&Y ever make any representations related solely to the Petrodrill Project.

[3] The 3-21-00 EACs were filed under seal as Exhibit "C" to Travelers' Motion. At the risk of oversimplification, the $60 million loss estimate is calculated by subtracting the total estimated costs of building the Petrodrill semisubmersible rigs from the fixed contract prices.

But because Travelers appears to be critical of the various estimates in the 3-21-00 EACs that were provided to E&Y in connection with its audit of the Financial Statements, E&Y retained Mr. F. Tim Pease as an expert witness -- primarily to analyze the 3-21-00 EACs and to determine whether those EACs, together with the methods FGH used to generate them, were reasonable.[4]  As Travelers acknowledges, Mr. Pease has had a long "and distinguished career as an engineer and designer of [semisubmersible] oil drilling rigs."  (Travelers' Brief at 4.)  Nonetheless, Travelers is apparently seeking to preclude Mr. Pease from offering *any*[5] opinions at trial, even though Travelers discusses and challenges only three of Mr. Pease's six opinions in its Motion and Brief.  As set forth below, the evidence overwhelmingly demonstrates that Mr. Pease's credentials, methods, and factual bases are all sufficient to satisfy the requirements for admissibility.  Accordingly, Travelers' Motion should be denied in its entirety.

## II.  ARGUMENT AND CITATION OF AUTHORITY

Travelers' Motion contends that Pease's Report and testimony should be stricken (1) because Mr. Pease is allegedly not qualified to testify as to the reasonableness of the 3-21-00 EACs, (2) because his opinions are allegedly based upon his own subjective belief or unsupported speculation, and (3) because he has allegedly not used a legitimate or testable expert methodology to reach his opinions.  Travelers ignores Mr. Pease's relevant credentials and

---

[4] A copy of Mr. Pease's expert witness report (hereinafter cited "Pease Rpt.") was filed under seal as Exhibit "A" to the Motion.

[5] Travelers' Motion requests entry of an order "striking that part of Mr. Downey's [sic] Report stating that Travelers did not rely on the 1999 10-K, or that it played no role in Travelers' decision to recommend issuance of the Bond, and precluding Mr. Downey [sic] from offering any related testimony."  (Travelers' Motion at 2.)  Obviously, Travelers' Motion is directed at Mr. Pease, although the mistaken reference to Mr. Downey (E&Y's surety underwriting expert) in the "Wherefore" clause makes it difficult to ascertain with precision Travelers' requested relief.  Travelers' Brief asks for "entry of an order precluding the proffered opinions and testimony of Mr. F. Tim Pease," even though the Brief does not acknowledge, discuss, or attack three of Mr. Pease's six opinions.  (Travelers' Brief at 19.)

3

repeatedly mischaracterizes his opinions by setting up and beating down tiny straw men while ignoring most of the many bases for Mr. Pease's opinions. At best, the contentions in Travelers' Motion are nothing more than an attempt to challenge the bases and sources of Mr. Pease's opinions, which under the governing standards go to the weight -- not the admissibility -- of the testimony.

### A. The Applicable Standards

Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. "Rule 702 assigns to the district judge a gatekeeping role to ensure that [expert] testimony is both reliable and relevant." *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999). "Although the *Daubert* analysis is applied to ensure expert witnesses have employed reliable principles and methods in reaching their conclusions, the test does *not* judge the expert conclusions themselves." *Mosley v. Waffle House, Inc.*, No. 1:04 CV816LG-RHW, 2006 WL 1028961, at *3 (S.D. Miss. Apr. 14, 2006) (Guirola, J.). Judging Mr. Pease's conclusions, however, is precisely what Travelers would have this Court do by granting its Motion.

As the Advisory Committee Note to the 2000 amendment to Rule 702 explains, "[after *Daubert*] rejection of expert testimony is the exception rather than the rule":

> *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the

4

adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996). As the Court in *Daubert* stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 595. Likewise, this amendment is not intended to provide an excuse for an automatic challenge to the testimony of every expert. *See Kumho Tire Co. v . Carmichael*, 119 S. Ct.1167, 1176 (1999) (noting that the trial judge has the discretion "both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.").

FED. R. EVID. 702 advisory committee's note (2000). Consistent with the Supreme Court's findings in *Kumho Tire*, the Advisory Committee expressly recognized that "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *Id.*

### B. Mr. Pease Is Qualified to Opine on the Reasonableness of Construction Cost Estimates and Related Procedures in the Semisubmersible Drilling Rig Industry

As the Supreme Court instructed in *Kumho Tire* and as this Court recognized in *Berhow v. Peoples Bank*, No. 1:04 CV511-LG-RHW, 2006 WL 839529 (S.D. Miss. Mar. 28, 2006), where the expert testimony is non-scientific, the inquiry into an expert's reliability should focus upon the expert's personal knowledge or experience. *Kumho Tire*, 526 U.S. at 150; *Berhow*, 2006 WL 839529, at *2-3 (Guirola, J.) (noting that "not all of the *Daubert* factors will be applicable in determining whether an expert's proposed testimony is reliable, particularly when an expert's testimony is based upon practical experience"). Both Mr. Pease's testimony and his Report demonstrate that he has ample qualifications and experience to satisfy Rule 702, *Daubert*, and *Kumho Tire*.

As shown by his CV (Exhibit 1 to Pease Rpt.), Mr. Pease has over forty-five years of experience in the offshore drilling, petroleum, and marine industries. He holds a Bachelor's of Science in Civil Engineering from Rice University and a Master's in Civil Engineering from the

5

University of Houston. (Pease Rpt. at 17 & Ex. 1.) He also attended the Advanced Management Program of the Harvard Graduate School of Business Administration. (*Id.*) Mr. Pease's professional experience includes:

- serving as project engineer with the Offshore Company;

- serving as Vice President of Engineering, Construction, Research and Development for the Offshore Company;

- serving as Managing Director of the Offshore Company's European subsidiary;

- serving as the Offshore Company's Senior Vice President of Operations and Senior Vice President of Business Development (the number two position in the Company);

- managing the design, contract negotiations, construction supervision and resolution of shipyard extra claims for twenty-six large (ten state-of-the art) mobile offshore drilling units and numerous drilling rig modification programs and upgrades;

- participating in licensing technology and patent rights related to offshore drilling rights;

- recipient of the Blakely Smith Medal for outstanding accomplishment in the field of ocean engineering;

- induction into the Offshore Energy Center's Hall of Fame as an Industry Pioneer and Technical Pioneer in the fields of mobile drilling units; jack-up rigs; and safety and the environment: code development;

- recipient of a citation for service from the American Petroleum Institute and a Certificate of Appreciation for Outstanding Service as an instructor from the International Association of Drilling Contractor and the University of Texas; and

6

- providing advisory services to U.S. and foreign shipyards and in legal proceedings, including technical evaluation, dispute resolution, patent analysis, market analysis and evaluation of oilfield development programs.

(*Id.*)  Mr. Pease has served as the technical advisor in several significant international arbitrations involving offshore drilling rigs.  Finally, and of particular significance, Mr. Pease has been actively involved in preparing, reviewing, and approving cost estimates, change-orders, and shipyard contracts related to offshore drilling rigs.  (*Id* at 17.)  Thus, Mr. Pease plainly satisfies Rule 702's requirement that the witness be qualified as an expert by "knowledge, skill, experience, training or education."  FED. R. EVID. 702; *Crowley v. Chait*, 322 F. Supp. 2d 530 (D.N.J. 2004).

### C.  Mr. Pease's Opinions Are Based on Reliable Methods That Satisfy Rule 702

Rule 702 requires that Mr. Pease (1) support his conclusion with sufficient facts, (2) use reliable principles and methods, and (3) apply the principles and methods reliably to the facts of the case.  FED. R. EVID. 702.  Mr. Pease has done just that.  As discussed below, there is a substantial evidentiary record supporting his opinions and conclusions about the 3-21-00 EACs and FGH's process for preparing them.  And the principles and methods used by Mr. Pease -- reviewing the EACs, the EAC files, the American Bureau of Shipping ("ABS") report and related documentation, and pertinent witnesses' entire transcripts rather than isolated portions of testimony[6] -- have been found by other courts to be reliable.  *See, e.g.*, *Crowley*, 322 F. Supp. 2d at 530; *Century Indem. Co. v. Aero-Motive Co.*, 254 F. Supp. 2d 670 (W.D. Mich. 2003).  The substantial evidence supporting Mr. Pease's opinions demonstrates that Mr. Pease applied the principles and methods reliably to the facts of this case.

---

[6] Pages 15-16 of Mr. Pease's Report list the various deposition transcripts, deposition exhibits, and other materials that Mr. Pease reviewed and/or relied upon in forming his opinions.

Travelers first argues that Mr. Pease's opinion that the estimates in the 3-21-00 EACs were reasonable should be excluded because Mr. Pease "does not know how the 3-21-00 EACs were prepared." (Travelers' Brief at 6-7.) Travelers' argument in this regard is short and simple: at his deposition, counsel for Travelers asked Mr. Pease whether he ever reviewed any "detailed breakdown by craft" of the hours contained in the 3-21-00 EAC. (*Id.*) Mr. Pease testified that he had not reviewed such documents because it was his understanding that no such documents were produced during discovery. (*Id.*) From that testimony, Travelers draws the astonishing conclusion that, if Mr. Pease did not review documents showing a detailed breakdown of man-hours by craft, then Mr. Pease does not know *how* the 3-21-00 EACs were prepared. (*Id.*)

Travelers' argument is nonsensical and misleading. Just because some of the detailed accounting documents (like employee timecards) were not produced in discovery does not mean that Mr. Pease does not know *how* FGH went about preparing the 3-21-00 EACs. If Travelers had wanted to learn Mr. Pease's understanding of *how* FGH prepared the 3-21-00 EACs, all it had to do at his deposition was ask a direct question like "How were the 3-21-00 EACs prepared?" But Travelers' counsel never asked such a direct question. Travelers also ignores Mr. Pease's Report where he summarizes *how* the EACs were prepared:

> The FGH 3-21-00 EACs were prepared by the Amethyst Project Director, Bill Bingle, (a Mechanical Engineer with considerable shipyard project management experience). These were thoroughly reviewed and reconfirmed by a senior FGH management official (Ron Schnoor, who was the FGH Offshore Group President) using his own calculation and estimation procedures. I believe these approaches were reasonable and appropriate under the circumstances.
>
> In doing their EAC-related work, both Bingle and Schnoor consulted with appropriate operational personnel (including the production manager) and obtained their input. They properly worked with production personnel in each of the relevant segments in getting information in order to prepare the 3-21-00 EACs. Some of the financial information in the 3-21-00 EACs was provided by and/or properly reviewed by FGH financial personnel (Walker Foster). The 3-21-00 EACs were developed over a period of at least 3 months, providing ample time to develop a reasoned and thorough cost estimate.

(Pease Rpt. at 12.)

Just because Mr. Pease did not obtain and review every single piece of paper that might provide part of the support for the 3-21-00 EACs (such as time cards for the thousands of employees who worked on the Petrodrill Project) does not mean that he does not know *how* the 3-21-00 EACs were prepared.  At most, arguments concerning the extent of information reviewed by Mr. Pease go to the weight of his opinion -- not its admissibility.  *See United States v. 14.38 Acres of Land*, *More or Less Situated in Leflore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("[I]n determining the admissibility of expert testimony, the district court should approach its task 'with proper deference to the jury's role as the arbiter of disputes between conflicting opinions.  As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration'")); *see also Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546 (5th Cir. 2004) (quoting *United States v. 14.38 Acres of Land*).

Travelers' second argument is similar to its first:  Travelers argues that Mr. Pease should not be able to express an opinion on the reasonableness of the man-hour estimates in the 3-21-00 EACs because he "does not know *how* the *EAC worksheet* was prepared."  (Travelers' Brief at 7-12.)  Here, Travelers is referring to a separate worksheet that is attached to the 3-21-00 EACs for each of the two Petrodrill semisubmersible rigs (*i.e.*, one EAC worksheet for B-103 and another EAC worksheet for B-104; these two EAC worksheets were filed under seal as part of Exhibit "C" to Travelers' Motion).  These two EAC worksheets break out the more than 4 million estimated total labor hours between the two Petrodrill rigs (B-103 and B-104) into 17 separate

9

categories, four of which are discussed in Travelers' Brief. The 17 categories and the total labor man-hour estimates in the 3-21-00 EACs are set forth below:

|      |                      | B-103 Labor Hours Estimate | B-104 Labor Hours Estimate |
|------|----------------------|---------------------------:|---------------------------:|
| (1)  | General              | 6,189                      | 18,306                     |
| (2)  | Structural steel     | 877,834                    | 635,555                    |
| (3)  | Outfitting steel     | 135,880                    | 124,990                    |
| (4)  | Underwater gear      | 1,005                      | 431                        |
| (5)  | Machinery            | 62,434                     | 57,761                     |
| (6)  | Piping - HVAC        | 347,645                    | 380,287                    |
| (7)  | Electrical           | 238,031                    | 254,859                    |
| (8)  | Outfitting           | -                          | -                          |
| (9)  | Carpentry            | 3,519                      | 3,664                      |
| *(10)* | *Miscellaneous*    | *330,141*                  | *259,876*                  |
| (11) | Material handling    | 76,903                     | 77,779                     |
| (12) | Quality control      | 31,621                     | 36,596                     |
| *(13)* | *Rework*           | *27,018*                   | *813*                      |
| (14) | Incline              | 3,240                      | 3,083                      |
| *(15)* | *Program management* | *47,338*                | *614*                      |
| *(16)* | *Program support*  | *12,347*                   | *4,171*                    |
| (17) | Engineering          | 125,468                    | 58,184                     |
|      | Total Labor Hours Estimate | 2,268,928            | 1,916,969                  |

(*Source*: EAC Worksheets, Exhibit "C" to Travelers' Motion.) The four italicized and bolded items in the above list are the only four categories that are discussed or even mentioned in Travelers' Motion. (*See* Travelers' Brief at 7-8 (discussing Mr. Pease's deposition testimony on the "Miscellaneous" hours category of the EAC worksheets), 9 (discussing "Program Management" and "Program Support" categories) and 11-12 (discussing "Rework" hours category).)

In his Report, Mr. Pease opines on the reasonableness of the 3-21-00 EACs in their entirety. He never separately and individually opines on the reasonableness of the labor hours set forth in any or each of these 17 categories by itself. Nonetheless, at his deposition, Mr. Pease was asked to explain why the labor hours in the "miscellaneous," "program management,"

10

"program support," and "rework" categories were reasonable.[7]  Since he was not engaged to separately review each of these categories, his answers to such questions were limited.  Based solely on his deposition testimony, Travelers has argued that Mr. Pease lacks a sufficient basis for his expert opinions under Rule 702.  (Travelers' Brief at 6-12.)

Travelers' argument is a classic instance of "setting up your own straw man and beating it down."  Even though Mr. Pease never opines anywhere in his Report that any one of the 17 categories is a reasonable estimate of the hours needed for that particular category, Travelers assumed that was his opinion and now argues that, because Mr. Pease cannot support *that particular opinion* (as to which he was not even engaged and has not opined), his entire Report should be excluded.

The Court should ignore Travelers' straw man.  E&Y did not retain Mr. Pease to opine on whether the labor man-hours in each of the 17 categories on the EAC worksheets are, in and of themselves, reasonable.  As stated in his Report, Mr. Pease's opinion is that the estimates for total man-hours in the 3-21-00 EACs are reasonable.  And his Report gives the numerous bases for his opinion in that regard, including:

- Mr. Pease compared the man-hour estimates in the 3-21-00 EACs to published US Navy curves for vessels of similar weight and found the man-hours to be reasonable when compared to such curves.  (Pease Rpt. at 4.)

- Mr. Pease compared the man-hour estimates in the 3-21-00 EACs to other semisubmersibles with which Mr. Pease has had first hand experience and found that

---

[7] It should be noted that counsel for E&Y objected to the form of these questions.  (*See, e.g.*, Travelers' Brief at 8, 9 (quoting testimony that includes numerous objections to form).)  Among other reasons, these objections were interposed because Travelers was asking Mr. Pease to explain the basis for "opinions" that Mr. Pease has not been engaged to proffer.

11

gave him a basis for concluding the man-hours in the 3-21-00 EACs to be reasonable. (*Id.* at 5.)

- Mr. Pease reviewed the independent analysis of the Petrodrill Project that was performed by ABS, compared the ABS analysis to the 3-21-00 EACs, and concluded that the ABS work independently confirmed the reasonableness of the estimates in the 3-21-00 EACs. (*Id.* at 13.)

- Mr. Pease reviewed the relevant contracts, noted that they specified a weight limitation of 9,075 metric tons, and concluded that this limitation gave Halter a clear idea of the *maximum* amount of steel, machinery, and outfit material Halter would be required to supply. (Pease Rpt. at 3.)

- Based on objective facts, Mr. Pease concluded that, in preparing the original bid estimates, Halter could properly estimate a short construction period because the particular semisubmersible rigs that Petrodrill ordered were for use in moderate offshore environmental conditions and were considerably smaller than other 5th generation semisubmersible rigs being ordered in the late 1990s. (*Id.* at 4.)

- Mr. Pease compared the semisubmersible rigs ordered by Petrodrill to the Amethyst I semisubmersible rig that had been in operation since 1987, and concluded, based on this objective fact, that Halter would not have had to build a prototype. (*Id.*.)

- Mr. Pease observed that the classification society for the Petrodrill rigs was the same as for the Amethyst I rigs, and based on this fact, he concluded that Halter could reasonably expect there would be less delay in approving construction drawings. (*Id.*)

- Mr. Pease reviewed Halter's prior experience in successfully handling three significant semisubmersible upgrade projects (as well as a significant jackup project).

12

> From these objective facts, Mr. Pease concluded that Halter had information and experience that would enable it to make meaningful cost estimates. (*Id.*)
>
> - Mr. Pease compared the estimates in the 3-21-00 EACs to the owner's requirements and expectations and found that this gave him a further objective basis for concluding that the estimates in the 3-21-00 EACs were reasonable. (*Id.*)
>
> - Mr. Pease studied and analyzed the process by which FGH prepared the 3-21-00 EACs and concluded that it was a reasonable process. Based on his experience, a reasonable process leads to reasonable EACs. (*Id.* at 12-13.)

In short, as the ten points above show, Mr. Pease's overall opinion as to the reasonableness of the man-hour estimates in the 3-21-00 EACs is supported by a wide variety of *non-speculative facts* obtained through his review of the record and his own experience. For example, as summarized in the first bullet point above, in arriving at his opinion on the reasonableness of the cost estimates in the 3-21-00 EACs, Mr. Pease consulted an *extrinsic* source -- the published US Navy curves for vessels of similar lightship weight. Mr. Pease found that the man-hour labor estimates in the 3-21-00 EACs were actually more conservative (*i.e.*, higher) on a per ton basis than the published and objective standards and guidelines in the US Navy curves. This is a *fact*, not a *speculative guess*, and this particular *fact* is just one of many factual bases for the opinion that Mr. Pease formed on the reasonableness of the estimates contained in the 3-21-00 EACs.

Travelers' third argument is that Mr. Pease should be precluded from testifying at trial as to the reasonableness of the estimates in the 3-21-00 EACs because he "does not know how the subcontract estimates were prepared." (Travelers' Brief at 12.) The Petrodrill Project used (and the 3-21-00 EACs include) numerous subcontracts, which are summarized and detailed in Table V to Mr. Pease's report. As shown in that Table, there were subcontracts in more than eleven

13

different categories[8] and the total estimated cost of these numerous subcontracts exceeded $22 million of the total amount on the 3-21-00 EACs. At Mr. Pease's deposition, Travelers focused on only one of these eleven subcontract categories (Trials and Commissioning) in the relatively small amount of $200,000. Notwithstanding that Mr. Pease was only asked about this one subcontract (which is less than 1% of the total amount for subcontracts), Travelers argues that Mr. Pease does not know how any of the subcontract estimates were prepared. As shown in Mr. Pease's Report, subcontracts are part of the 3-21-00 EACs and, as already shown *supra* at page 8, Mr. Pease's Report summarizes how the EACs were prepared.

Travelers has here set up yet another straw man by assuming that Mr. Pease is going to opine at trial that $200,000 was an adequate amount to cover the costs for "trials and commissioning" of the Petrodrill semisubmersible drilling rigs. But again, this is not the case. The Financial Statements do not separately disclose an estimate solely for "Trials and Commissioning" of the Petrodrill rigs, and Mr. Pease was not engaged to render an opinion on whether $200,000 would be sufficient for this purpose. He was engaged to opine on the reasonableness of the 3-21-00 EACs in their entirety -- and he has sufficient bases (many of which were never explored by Travelers at his deposition) for doing so. (*See supra* pages 11-13.)

Travelers' fourth argument (Travelers' Brief at 13-16) focuses on Mr. Pease's final opinion that "the significant cost increases that occurred after the 3-21-00 EACs were prepared were attributable to facts that were not known (or reasonably anticipated) in March 2000." (Pease Rpt. at 14.) The factual bases for Mr. Pease's final opinion are summarized in his Report:

---

[8] The categories where there were subcontracts were (1) general, (2) outfitting steel, (3) machinery, (4) piping - HVAC, (5) electrical, (6) carpentry, (7) quality control, (8) incline, (9) trials/commissioning, (10) mating/launch, and (11-13) engineering/program management/program support. (Pease Rpt., Table V.)

14

> Based on my review of the documents and depositions and my own personal experience, it is my further opinion that the additional losses that materialized after 3-21-00 are largely due to the faulty performance of the supplier of the basic electrical design documentation and the unreasonable demands of Petrodrill, and that FGH did not, in March 2000, know (and could not reasonably have anticipated) that these factors would significantly increase the cost estimates that are contained in the 3-21-00 EACs.
>
> Bingle, in my opinion, accurately summarizes some of the many problems caused by the continued and unexpected delays associated with Alstom's inability to timely deliver the basic electrical design documentation. In my opinion, it was the mostly post-August 2000 delays in getting the necessary drawings from Alstom that caused a significant portion of the cost increases over and above the 3-21-00 estimates. My opinion is supported by my review of the areas where the costs increased over and above the estimates that were in the 3-21-00 EACs. One specific example is the FMEA (Failure Mode and Effect Analysis), which is required for the DP3 (Dynamic Positioning 3) class rigs. The FMEA affects most aspects of the layout and arrangement and installation of the machinery, piping, wiring, etc. of the machinery spaces of the rig. The documents I have reviewed show that, in March 2000, FGH thought it would be getting a complete set of FMEA documents in the relatively near future, but FGH still had apparently not received a consolidated FMEA even by March 2001. In my opinion, Alstom's unexpected failure to deliver a full and final set of FMEA drawings when originally anticipated was one of the largest reason why the loss on these rigs increased even after the March 21, 2000 estimates.

(*Id.* (citations to deposition testimony and exhibits omitted).)

In seeking to exclude Mr. Pease's final opinion, Travelers has again cherry-picked a couple of minor issues while ignoring the factual bases for Mr. Pease's opinion. Rather than questioning Mr. Pease about the unexpected delays associated with Alstom's inability to timely deliver the basic electrical design documentation, Travelers instead directed Mr. Pease to a table in his Report where he charted and detailed some of the specific areas where materials and subcontracts increased after March 2000 and then asked if he knew exactly why those amounts increased after March 2000. (Travelers' Brief at 13-15.) Again, Mr. Pease has not been asked by E&Y to opine, for example, why underwater gear materials and subcontracts increased by $1.8 million after March 2000. Rather, E&Y asked Mr. Pease for his opinion as to the significant reasons why the aggregate costs on the Petrodrill rigs increased after March 2000.

15

Mr. Pease's opinion in that regard -- and the bases therefore -- are detailed in his Report (as shown above), even if Travelers chose not to focus on that issue at Mr. Pease's deposition.

Travelers also makes much of the fact that Mr. Pease has no basis for assuming that the post-March 2000 increases in the labor rates were reasonable. (Travelers' Brief at 15-16.) As Mr. Pease acknowledged in his Report, he did not independently verify the reasonableness of the labor rates (although he did say that they were not unreasonable in his experience and that he saw evidence that the labor rates came from FGH's accounting records and were based on FGH's historical rates). (Pease Rpt. at 13.) In short, with respect to labor rates, Travelers asks the Court to exclude opinions that Mr. Pease *has not formed* and testimony that Mr. Pease has already stated he *does not intend to offer*.

Travelers' fifth argument is that Mr. Pease's opinions should be excluded because he has no "identifiable, testable, expert methodology" but only "repeatedly assumed or speculated that FGH and its project manager . . . had properly prepared various aspects of the 3-21-00 EACs." (Travelers' Brief at 16-19.) This argument is disingenuous. In making it, Travelers must ignore virtually all of Mr. Pease's Report, which sets forth the numerous factual bases for his various opinions (some of which were set forth at pages 11-13, *supra*). None of those ten different factual bases are "speculative." Travelers may have intentionally chosen not to inquire about most of these ten bases at Mr. Pease's deposition, but that does not mean that they do not exist or that any of them are speculative.

Travelers also boldly asserts (without support) that Mr. Pease should be precluded from testifying because he does not rely on "any type of identifiable, testable, expert methodology." (Travelers' Brief at 16.) This argument must also be rejected. Mr. Pease is not a scientific witness, and it is appropriate for him to rely on his own personal knowledge and expertise.

16

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (when the expert is an engineer and his testimony is non-scientific, the inquiry into the expert's reliability necessarily focuses on the expert's personal knowledge or experience); *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (a witness who is an expert "by knowledge, skill, experience, training, or education," FED. R. EVID. 702, is permitted to testify when he is "qualified to testify competently regarding the matters he intends to address"); *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360 (5th Cir. 2006) (permitting testimony of experts who have acquired their expertise through experience); *Primrose Operating Co.*, 382 F.3d at 563 (same). As shown above, the principles and methods used by Mr. Pease -- reviewing the EACs, the EAC files, the ABS Report and related documentation, and pertinent witnesses' entire transcripts rather than isolated portions of testimony -- have been found by other courts to be reliable. *See, e.g.*, *Crowley*, 322 F. Supp. 2d at 537-41; *Century Indem. Co.*, 254 F. Supp. 2d at 677. Moreover, the substantial evidence supporting Mr. Pease's opinions demonstrates that Mr. Pease applied the principles and methods reliably to the facts of this case. And finally, as explained above, Mr. Pease did consult other external, objective sources (for example, the U.S. Navy curves and the ABS report and analysis) in arriving at his own opinions. (*See supra* pages 11-13.)

Finally, Travelers argues that the "entire premise of the proffered opinions, that Pease can determine the 'reasonableness and appropriateness' of FGH's 3-21-00 EACs and their preparation, is legally suspect and improper." (Travelers' Brief at 18-19.) In support, Travelers cites two cases, neither of which applies. Travelers' first case, *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992), is distinguishable because it involved a case where the court held that the proffered expert testimony was inappropriate because "the reasonableness and foreseeability of the casual workers' reliance were matters of law for the

17

court's determination." Travelers' second case, *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995), is similarly distinguishable in that it involved a police search and the court excluded the expert testimony because the expert's testimony "was not a fact-based opinion, but a statement of legal conclusion" that was "for the court to make." To the extent Travelers is attempting to suggest that it is *never* appropriate for an expert to opine that something (like, for example, the EACs) is "reasonable," Travelers is simply mistaken. *See, e.g.*, *Oxford Gene Technology Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 443 (D. Del. 2004) (permitting expert to testify on the "issue of reasonable corporate behavior"); *Wrench LLC v. Taco Bell Corp.*, No. 98 Civ. 45, 2003 U.S. Dist. LEXIS 7608, at *16-17 (W.D Mich. May 2, 2003) (permitting expert testimony on the reasonableness of the terms in a licensing proposal); *R. B. Ventures, Ltd. v. Shane*, 91 Civ. 5678 (CSH), 2000 WL 520615, at *5 (S.D.N.Y. May 1, 2000) (permitting experienced real estate broker to provide expert testimony as to the reasonable value of brokerage services). Mr. Pease's opinions with respect to the reasonableness of the EACs and the EAC preparation process relate to factual issues in the case, not legal ones and, therefore, are properly the subject of expert testimony.

## **CONCLUSION**

For the reasons set forth herein, E&Y respectfully requests that the Court deny Plaintiff's Motion to Exclude Testimony and Expert Report of F. Tim Pease.

Respectfully submitted this 16th day of June, 2006.

| | |
|---|---|
| KING & SPALDING LLP | BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC |
| /s/ *Joseph B. Haynes* | James B. Galloway |
| Joseph B. Haynes (Pro Hac Bar #43866) | MSB No. 4382 |
| Georgia Bar No. 340600 | Post Office Drawer 4248 |
| L. Joseph Loveland (Pro Hac Bar # 44389) | Gulfport, Mississippi  30502 |
| Georgia Bar No. 459350 | Phone:  228/864-1170 |
| Michael M. Raeber (Pro Hac Bar # 43935) | |
| Georgia Bar No. 591722 | OF COUNSEL: |
| Cheri A. Grosvenor (Pro Hac Bar #43867) | |
| Georgia Bar No. 314360 | William A. Barrett (Pro Hac Bar #43884) |
| 1180 Peachtree Street | Ernst & Young LLP |
| Atlanta, Georgia  30309 | 5 Times Square |
| Phone:  404/572-4600 | New York, New York  10036-6530 |
| | |
| | Attorneys for Defendant |
| | Ernst & Young LLP |

**CERTIFICATE OF SERVICE**

     I, Joseph B. Haynes, attorney for Defendant, Ernst & Young LLP, do hereby certify that I have this date caused a true and correct copy of the foregoing to be filed with the Court's CM/ECF system, which will automatically serve copies to the following attorneys of record:

> Andrew V. Tramont
> AVT@rtgn-law.com
> Paulino A. Nunez
> PAN@rtgn-law.com
> Rodriguez Tramont Guerra & Nunez, PA
> Coral Gables Corporate Plaza
> 2100 Ponce de Leon Blvd., Penthouse II
> Coral Gables, FL 33134

     This 16th day of June, 2006.

                                                  */s/ Joseph B. Haynes*
                                                  Joseph B. Haynes