UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

TRAVELERS CASUALTY & SURETY
COMPANY OF AMERICA, a Connecticut                    CIVIL ACTION NO.: 1:03cv762Ro
corporation,

       Plaintiff,

v.

J. L. HOLLOWAY; EMILE DUMESNIL;
CHARLES DECUIR; JOHN ALFORD;
RICHARD T. MCCREARY; RICK REES;
JOHN DANE, III; ALAN A. BAKER; T.
JAY COLLINS; JEROME L. GOLDMAN;
GARY KOTT; RAYMOND E. MABUS;
ANGUS R. COOPER, II; BARRY J. GALT;
KENNETH W. LEWIS; and ERNST &
YOUNG, L.L.P.

       Defendants.
_____/

**Travelers' Rebuttal Memorandum in Support of Motion
To Exclude Expert Testimony– F. Tim Pease**

Plaintiff, Travelers Casualty and Surety Company of America ("Travelers"), respectfully submits this rebuttal memorandum in support of its motion to exclude expert testimony from F. Tim Pease ("Pease"). Travelers moved to exclude Pease's testimony because, among other things, he is not qualified to give the proffered testimony, the proffered opinions are not based upon a valid or testable methodology and the testimony is based on Pease's unsupported speculation and subjective beliefs.

Defendant, Ernst & Young, L.L.P., ("E&Y") argues that the testimony should be admitted because of Pease's general experience in the oil drilling rig business and because he has been asked to testify about FGH costs "in their entirety" and not about any specific (testable) costs.    As

demonstrated below, E&Y is wrong.  Further, E&Y has now admitted that Pease's testimony is not relevant.  For all of these reasons, Pease's testimony should be excluded.

I.  **Pease is Not Qualified to Give Expert Testimony as to the Reasonableness of the FGH (Shipyard) Cost Estimates Contained in The 3-21-00 EACs**

Travelers' Memorandum ("Memo") argues that Pease is not qualified to give the proffered testimony.   Pease's opinions purport to assess the reasonableness of EACs or construction cost estimates prepared by a shipyard, FGH.  In the case of the 3-21-00 EACs, FGH provided an estimate of the total by which FGH's construction costs would exceed the fixed contract price agreed to by FGH's client, Petrodrill.  Pease, however, has never been privy to actual *shipyard* costs (as opposed to the costs passed along by shipyards to owners) nor does he have information regarding the total number of labor hours (and hence total costs) expended by any shipyard on a rig building project:

> Significantly, Pease has no information regarding the costs that any shipyard may have had to absorb for its own account due to an inability to complete a drilling rig construction project for an amount equal to or less than the agreed-upon fixed contract price. . . . [A]lthough there is evidence reflecting that FGH itself spent three times the number of labor hours it originally estimated that it would require to complete another drilling rig it built contemporaneously with Petrodrill, Pease . . . had never seen information demonstrating that a shipyard had expended a multiple of its originally estimated labor hours.

Memo at 4-5 (footnote omitted).

E&Y's Response essentially reprints Pease's resumé.  E&Y sets out a number of tasks Pease has performed and awards he has received.  *See* E&Y Response at 5-7.  None of this, however, responds to the issues raised in the Memo.  Again, although Pease has been asked to opine specifically about the reasonableness of FGH's estimate of its own (shipyard) costs, he simply does not have the experience necessary to give such opinions, nor does he even have information regarding

shipyard costs.[1]  E&Y does not and cannot deny this.  In *Gipson v. Fleet Mortgage Group, Inc.*, 232 F.Supp.2d 691, 707-09 (S.D.Miss. 2002) (Lee, C.J.), the court addressed a motion to exclude an expert, who had experience in the insurance industry, from testifying about the issue of "force-placed" or lender placed insurance obtained by a mortgage lender.  The *Gipson* court described the proposed expert's experience stating:

> Bryson's [the proposed expert's] **experience in the insurance business**, upon which his expertise is grounded, **has been in casualty and property insurance**.  He has admitted that **he is** "**not familiar with a lot of lender placed insurance,**" and is "not exposed to that in his business to a great extent."  In fact, Bryson testified that only once has he dealt with lender-placed insurance, which was more than twenty years ago;  and he does not remember the details of the transaction.

232 F.Supp.2d at 708 (emphasis added).  The *Gipson* court excluded the proposed expert testimony about force-placed insurance because: "an expert is not required to be a 'specialist' . . . but Mr. Bryson's **knowledge base extends only to the standard insurance market**." *Id.* at 709 (emphasis added).  The reasoning of *Gipson* applies directly to Pease.  Although he undoubtedly has industry experience, he does not have experience or information regarding shipyard costs – the subject matter about which he has been asked to opine. Therefore, Pease is not qualified to give the testimony he has been asked to give by E&Y and should not be allowed to testify as an expert.

## II.    Pease's Opinions Are Not Based Upon a Valid or Testable Methodology. Accordingly, the Proffered Opinions Are Not Admissible Expert Testimony

Travelers' Memo also argues that Pease's testimony should be stricken because it is not based upon a valid or testable methodology.  As discussed in the Memo, the significant components of the

---

[1]    Thus, even if Pease's background was otherwise sufficient for him to develop an understanding of shipyard costs if he had been provided with relevant information, he admits that he does not have the information.  *See, e.g.,* Pease depo at 235-36.

3-21-00 EACs are labor costs and material and subcontract costs. The labor costs, in turn, are comprised of labor hours multiplied by a labor rate. Pease opines that: "3. The **cost estimates in the 3-21-00 EACs** were appropriate and reasonable." Report at 1 (emphasis added). When questioned in deposition, however, Pease was unable to explain how FGH computed the labor hours in several of the 17 categories described on an EAC "Worksheet" provided to E&Y. Nor could he explain why FGH's estimates in those categories were "reasonable." *See* discussion in Memo, § IV-B, at 7-12. E&Y now contends that this is entirely understandable. According to E&Y:

> Pease opines on **the reasonableness of the 3-21-00 EACs <u>in their entirety</u>**. He **never separately and individually opines on the reasonableness of the labor hours set forth in any or each of these 17 categories** [described in the EAC Worksheet] **by itself**.

E&Y Response at 10 (emphasis added); *see id.* at 11 ("Pease never opines anywhere in his Report that any one of the 17 categories is a reasonable estimate of the hours needed for that particular category.")

E&Y's tactic is clear, and would be convenient, if allowed. In effect, E&Y is attempting to make Pease's opinion untestable. The significance of the approach proposed by E&Y becomes clear when considered in the context of Pease's admission that, in order to prepare a labor hours estimate, FGH would have needed a breakdown of labor hours, not just by the 17 categories in the Worksheet, but into even smaller components – by craft. Pease testified: "**I don't think they could put this together without some backup by craft**." Pease depo at 219 (emphasis added). If Pease had analyzed a breakdown by craft (there is, in fact, no evidence that such a breakdown was ever prepared by FGH), or perhaps even if he could have analyzed the 17 Worksheet categories, it would be possible to test Pease's methodology. Because Pease apparently did nothing more than purport

to opine on the overall "reasonableness" of the 3-21-00 EAC costs "in their entirety," however, it is impossible to test Pease's methodology.

E&Y argues, in effect, that it is too much to insist that Pease's testimony should be based on a testable methodology. According to E&Y, the Court should look only to Pease's "experience" in determining whether his (untestable) methodology is a sufficient basis for providing expert testimony in these proceedings. *See* E&Y Response at 16-17. Contrary to E&Y's suggestion, there are standards applied to determine whether any expert can testify. Most fundamentally, of course, a court is "not required 'to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.'" *Burleson v. Texas Department of Criminal Justice*, 393 F.3d 577, 587 (5th Cir. 2004) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). Indeed, E&Y itself states, in another response memorandum submitted in this very case, that: "When determining the reliability of the methods used in arriving at specialized but non-scientific expert opinions, 'the admissibility . . . test is whether the particular opinion is based on valid reasoning.'" E&Y Response in Opposition to Plaintiff's Motion To Exclude Expert Testimony of Robert Alvis Davidson, at 9 (citing *ProtoComm Corp v. Novell Advanced Servs., Inc.*, 171 F. Supp. 2d 473, 478 (E.D. Pa. 2001)(internal quotation marks omitted) (quoting *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145-46 (3d Cir. 2000)). Plainly, a proponent of expert testimony cannot rely solely on the fact that an expert "said so" as basis for admission of proffered expert testimony.

Obviously recognizing that something more than "Mr. Pease says so" is necessary, E&Y insists that Pease's testimony regarding the "reasonableness" of  the 3-21-00 EAC costs "in their entirety" is supported by an "extrinsic" source and "non-speculative facts." E&Y is wrong. Initially, it is important to note the context in which the 3-21-00 EACs were prepared by FGH. As Pease

notes: "In **April, 1998**, **Halter Marine** ["Halter"] entered into two construction contracts with Petrodrill . . .. In November 1999, Halter Marine merged with Friede Goldman, and the two entities became Friede Goldman Halter ("FGH")." Report at 2 (emphasis added). Prior to the FGH merger, in connection with an earlier E&Y audit of Halter, in May, 1999, Halter prepared EACs (the "Halter EACs") estimating that the Petrodrill project would not cause Halter any losses but would, instead, essentially "break even." After the merger, in December, 1999, FGH prepared a cost estimate for Petrodrill that concluded that FGH would, in fact, lose $100 million on the Petrodrill contract. FGH working papers also reflect other higher loss estimates – as high as $132 million. Rather than providing any of those estimates in connection with the 1999 FGH audit completed by E&Y in March, 2000, FGH provided E&Y with the 3-21-00 EACs that contain a $60 million Petrodrill loss estimate.

In this context, E&Y's contention that Pease had valid "extrinsic" sources and "non-speculative facts" that could justify his opinion as to the "reasonableness" of the costs estimated in the 3-21-00 EACs, "in their entirety," cannot withstand scrutiny. E&Y provides 10 bullet point items that supposedly support its position. *See* E&Y Response at 11-13. First, E&Y insists that: "Pease compared the man-hour estimates **in the 3-21-00 EACs** to published US Navy curves for vessels of similar weight and found the man-hours to be reasonable when compared to such curves." *Id.* at 11 (emphasis added, citing Pease Report at 4). E&Y has the facts wrong. Pease's Report, in fact, does *not* compare the 3-21-00 EACs to the "Navy curves." Instead, Pease compares the Navy curves to Halter's pre-merger (break-even) estimate.[2] The distinction between the actual facts (the Report

---

[2]        *See* Report at 4 ("**Halter estimated** the construction . . . would require 6,391 metric tons of finished steel, and the steel fabrication would require 441,210 man-hours. **Halter**

(continued...)

compares the Navy curves to the pre-merger Halter EAC) and E&Y's mis-statement of the facts (that the Report compares the Navy curves to the 3-21-00 EACs) is more than significant.

The 3-21-00 EACs estimated a total of approximately 2.27 million labor hours to complete Petrodrill rig B-103.[3]  In contrast, Pease opines only that the labor hours suggested by the Navy curves are comparable to the approximate 1.1 million total labor hours estimated by Halter's pre-merger   (break-even) EAC.   *See* Pease Report at 4 (**Halter** estimate was "**Total 1,089,618 man-hours**" per rig); *see also* Ex. A-756 (Halter 5-11-99 EAC (handwritten) "Job B 103," "HRS. At Completion" "**1,069,207**").  Thus, Pease uses the Navy curves comparison *only* as support for the "reasonableness" of Halter's 5-11-99 EAC that estimated an approximate break-even result.  Pease does not suggest that the Navy curves support his opinions regarding the 3-21-00 EACs.

Similarly, seven of the nine other bullet point items in E&Y's Response again repeat the same mistaken factual assumption.  Because they repeat the same errors, those bullet points are reprinted below with our comments [bracketed and extending out to the full margins] following each bullet point.  We have also pointed out, within the bullet point item, the instances where E&Y expressly, and incorrectly, states that the portion of the Pease Report in question refers to the 3-21-00 EACs.  The erroneous E&Y bullet points, as they appear at pages 11-13 of E&Y's Response, together with our comments, are as follows:

> Mr. Pease compared the man-hour estimates in the **3-21-00 EACs** [WRONG] to other semisubmersibles with which Mr. Pease has had

---

[2](...continued)
used 52 mh/ton for pontoon fabrication . . . . In my opinion, ***these* estimates** were conservative when **compared to the US Navy curves** for a vessel of similar lightship weight, which suggests 40 mh/ton for hull structure fabrication in the United States.") (emphasis added).

[3]          *See* Pease Report, Table V ("3-21-00 manhours" Total "2,266,928").

first hand experience and found that gave him a basis for concluding
the man-hours in the **3-21-00** EACs  [WRONG] to be reasonable. (*Id.*
at 5.)

[The Pease Report at 5, in fact, compares Pease's experience with other semisubmersibles  drilling
rigs to the original, **Halter**, estimate.  Pease does *not* address, refer to or mention the FGH *3-21-00
EACs* in this part of his report.]

. . .

Mr. Pease reviewed the relevant contracts, noted that they specified
a weight limitation of 9,075 metric tons, and concluded that this
limitation gave **Halter** a clear idea of the maximum amount of steel,
machinery, and outfit material **Halter** would be required to supply.
(Pease Rpt. at 3.)

[Again, the Pease Report at 3, in fact, opines, as even E&Y states, that the "weight limitation of
9,075 metric tons" would have supported the original, **Halter** estimate (not FGH's 3-21-00 EACs).
Again, Pease does *not* address, refer to or mention the FGH *3-21-00 EACs* in this part of his report.]

Based on objective facts, Mr. Pease concluded that, **in preparing the
original bid estimates**, **Halter could properly estimate a short
construction period** because the particular semisubmersible rigs that
Petrodrill ordered were for use in moderate offshore environmental
conditions and were considerably smaller than other 5th generation
semisubmersible rigs being ordered in the late 1990s. (*Id.* at 4.)

[Again, the Pease Report at 4, in fact, opines, as even E&Y states, that **in preparing *the original
bid estimates***, **Halter** (not FGH in preparing the 3-21-00 EACs) could properly estimate a short
construction period.  Again, Pease does *not* address, refer to or mention the FGH *3-21-00 EACs* in
this part of his report.]

Mr. Pease compared the semisubmersible rigs ordered by Petrodrill to
the Amethyst I semisubmersible rig that had been in operation since
1987, and concluded, based on this objective fact, that **Halter** would
not have had to build a prototype. (*Id.*.)

[Again, the Pease Report at 4, in fact, opines, as even E&Y states, that **Halter** (not FGH) would not
have had to build a prototype.  Again, Pease does *not* address, refer to or mention the FGH *3-21-00
EACs* in this part of his report.]

Mr. Pease observed that the classification society for the Petrodrill
rigs was the same as for the Amethyst I rigs, and based on this fact, he

8

concluded that **Halter** could reasonably expect there would be less delay in approving construction drawings. (*Id.*)

[Once again, the Pease Report at 4, in fact, opines that the use of a particular "classification society," as even E&Y itself notes, could have led **Halter** (not FGH) to expect there would be less delay in approving construction drawings. Again, Pease does *not* address, refer to or mention the FGH *3-21-00 EACs* in this part of his report.]

Mr. Pease reviewed **Halter's** prior experience in successfully handling three significant semisubmersible upgrade projects (as well as a significant jackup project).From these objective facts, Mr. Pease concluded that **Halter** had information and experience that would enable it to make meaningful cost estimates. (*Id.*)

[Once again, the Pease Report at 4, in fact, opines as even E&Y states, that **Halter**'s prior experience would enable **Halter** to make meaningful cost estimates. Again, Pease does *not* address, refer to or mention the FGH *3-21-00 EACs* in this part of his report.]

Mr. Pease compared the estimates in the **3-21-00** EACs [WRONG] to the owner's requirements and expectations and found that this gave him a further objective basis for concluding that the estimates in the **3-21-00** EACs [WRONG] were reasonable. (*Id.*)

[Once again, the Pease Report at 4, in fact, opines that the owner's requirements would support the estimates in ***Halter's original EACs*,** not the estimates in the 3-21-00 EACs. Again, Pease does *not* address, refer to or mention the FGH *3-21-00 EACs* in this part of his report.]

E&Y is simply wrong – 8 of the 10 bullet point items that E&Y identifies as supporting Pease's opinion regarding "reasonableness" of the 3-21-00 EACs, in fact, support only an opinion regarding the Halter EACs. Again, the Halter EACs estimated less than 1.1 million total labor hours, whereas the 3-21-00 EACs estimated a total of approximately 2.27 million labor hours. Moreover, the only purpose identified by E&Y for presenting Pease's testimony was to suggest that the 3-21-00 EACs were somehow more "reasonable" than the post-merger estimates that FGH prepared showing Petrodrill losses of $100 million or more. There is, therefore, no legitimate basis for E&Y's attempt to prop up Pease's opinion regarding the 3-21-00 EACs by referring to matters that may support the

9

Halter EACs.         The two remaining bullet point items in E&Y's list also cannot support its effort to buttress Pease's opinions.  One of these items is a reference to a report prepared in August, 2000 by a third party, not by Pease.  The other item refers to Pease's supposed reliance on his own conclusion that the "process" by which the 3-21-00 EACs were prepared.  E&Y cannot use Pease's own conclusion to support his opinions in this bootstrap fashion.  Moreover, as demonstrated in Travelers' Memo, Pease does not know the most fundamental fact about how the 3-21-00 EACs were prepared.  *See* discussion in Memo, § IV-A.  Pease admitted that FGH could not prepare the labor hours estimates in the 3-21-00 EACs without having a breakdown of labor hours by craft.  *See* Pease depo at 219 ("I don't think they could put this together without some backup by craft.")  He also admitted, however, that he has never seen a breakdown by craft dated as of March, 2000,  when the 3-21-00 EACs were prepared.  There is, in fact, no evidence that such a breakdown was ever prepared by FGH.[4]  Thus, this also cannot serve as legitimate support for Pease's opinions regarding the 3-21-00 EACs.

     E&Y does not and cannot dispute the fact that Pease cannot support the "reasonableness" of any particular item of the labor hours estimates prepared used by FGH in connection with the 3-21-00 EACs.  Instead, it purported to find support for opinions as to the "reasonableness" of the 3-21-00 EACs "in their entirety."  As the above discussion demonstrates, however, Pease's opinions are also

---

[4]      E&Y attempts to evade this fact through misdirection.  The issue is not, as E&Y suggests, whether historical employee time sheet and accounting records were produced through discovery.  *See* E&Y Response at 8-9.  The necessary, but missing, breakdown by craft would be a detailed estimate prepared by, for example, the welding foreman estimating how many labor hours would be necessary to complete each of the known welding jobs that remained to be completed as of the date of the estimate.  Similar estimates would also be required from the foreman of each group of craftsmen.  Again, there is simply no evidence that FGH, in fact, prepared such a breakdown.  E&Y has not cited to any authority that would allow an expert to simply assume the existence of a fact that the expert himself admits is of such critical importance.

not supported by any of the other purported rationales identified by E&Y in its bullet points.  What

is left, therefore, is that Pease's "reasonableness" opinions regarding the 3-21-00 EACs, "in their

entirety," are supported by nothing more  than the fact that Pease says it is so.   Pease's "ipse dixit,"

however, cannot support admission of his testimony.  *See  General Elec. Co. v. Joiner*, 522 U.S. 136,

146, 118 S.Ct.

512 (1997) (court not required "to admit opinion evidence that is connected to existing data only by

the ipse dixit of the expert." ).  Pease's testimony should be excluded.

### III.     Pease Cannot Testify About the "Foreseeability" of FGH Cost Increases

E&Y  also  wants  Pease  to  testify  that  "significant  cost  increases  that  occurred  after  the

3-21-00 EACs were prepared were attributable to factors that were not . . . reasonably foreseeable"

by FGH in March, 2000.  Pease prepared 2 charts, Tables VI and VII to his Report, that identified

over $43 million in costs added to the FGH estimates between the dates of the 3-2100 EACs and

FGH's December, 2000 EAC.   When questioned  specifically  about  some  of  these  (presumably

unforeseeable in light of Pease's opinion) added cost subcontract items, however, Pease was unable

to explain why these costs were not "foreseeable" as of March, 2000.  *See* Memo at 13-15, § IV-D

1.  E&Y again insists, in effect, that it is too much to ask Pease to support his "unforeseeable" cost

theory.  Instead, E&Y says, it asked Pease to opine about "why the *aggregate costs* on the Petrodrill

rigs increased after March 2000"; and, conveniently, "Pease has not been asked by E&Y to opine,"

about why any particular costs were (supposedly) unforeseeable.[5]  *See* E&Y Response at 15.  In other

_____

[5]      E&Y's suggestion that Pease's "unforeseeable cost" opinion is somehow
supported by his statement that additional costs resulted from delays by FGH subcontractor,
Alstom, is baseless.  First, Pease has made no effort whatsoever to tie any (supposedly)
"unforeseeable" cost item to Alstom delays.  More importantly, the record evidence is clear that

(continued...)

words, E&Y again attempts to make Pease's opinion untestable and supported only by his "ipse dixit."

Incredibly, E&Y even suggests that Pease should be allowed to testify that the nearly $18 million worth of estimated cost increases stemming from FGH's change in labor rates was not "foreseeable." Pease expressly admits that he cannot testify about whether the FGH labor rates were reasonable. More importantly, the labor rates used by FGH in the December, 2000 EAC were equal to or lower than the rates used by Halter in the May, 1999 EAC. *See* Memo at 15-16. E&Y, of course, received the May, 1999 EAC when it audited Halter, and FGH openly used substantially lower labor rates to develop the 3-21-00 EACs than Halter had used 10 months earlier. (Significantly, FGH's 1999 10-K actually disclosed that FGH's labor costs had *increased*, "substantially," as a result of the November, 1999 merger.) E&Y would, of course, love to hide the negligent failure of its audit to account for FGH's unjustifiable use of reduced labor rates in the 3-21-00 EACs behind "expert" testimony. Pease, however, cannot be allowed to opine that FGH's use of labor rates in December, 2000 that were equal to (or less than) the May, 1999 labor rates was somehow not "foreseeable" in March, 2000. Plainly, such testimony is without any possible foundation and also fails to "'adequately account[] for obvious alternative explanations.'" *Kemp v. Biolab, Inc.*, 2005 WL 1595669, slip op. at * 4 (S.D. Miss. 2005)(citation omitted). Pease's "unforeseeable increase" opinions are not valid expert testimony and should be excluded.

_____

[5](...continued)
as of March, 2000, Alstom was many months late in delivering engineering drawings to FGH and Alstom itself had declared FGH in default due to non-payment and was not even communicating with the FGH construction personnel until after FGH and Alstom reached a settlement in May, 2000. There is, therefore, no possible basis upon which Pease could legitimately say that, in March when the 3-21-00 EACs were prepared, it was unforeseeable to FGH that Alstom would (continue to) be late in delivering required engineering drawings.

**IV.**   **Pease's Testimony is Not Relevant; Therefore, it Should be Excluded**

1.   Any Testimony That Pease Could Give Regarding the "reasonableness" of the 3-21-00 EACs "in Their Entirety" is Not Relevant

This Court has made clear that in performing its "gatekeeping" function with respect to proposed expert testimony, the Court must determine whether the testimony is relevant.[6]  Under governing precedent, this means: "The **expert testimony must be relevant**, not simply in the sense that all testimony must be relevant, Fed.R.Evid. 402, but also **in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue**." *Bocanegra v. Vicmar Svcs., Inc.*, 320 F.3d 581, 584 (5th Cir.2003) (emphasis added).  As a matter of law, expert testimony that is not relevant cannot be admitted. *See Berhow*, 2006 WL 839529, slip op. at *5 (proffered expert testimony "is not relevant and is therefore inadmissible.")

As discussed in section II, above, in an effort to somehow attempt to justify Pease's methodology (or lack thereof), E&Y has now been forced to admit that Pease was asked only to provide testimony regarding EAC costs "in their entirety."  As also demonstrated above, however, the methodology that E&Y insists was supposedly employed by Pease could serve only to address the "reasonableness" of the original Halter EACs.   But FGH prepared the 3-21-00 EACs long after the initial (Halter- May, 1999) EACs had proved horribly wrong.  The "reasonableness" of the original Halter EACs simply has no possible relevance to this case, where E&Y admits that it only retained Pease to opine about the "reasonableness" of the 3-21-00 EACs.

---

[6]   *See Berhow v. Peoples Bank*, 2006 WL 839529, slip op. at *2 (S.D.Miss. March 28, 2006) (Guirola, J.) ("Rule 702 assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable **and relevant**.")(quoting *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir.1999) (emphasis added); *see also Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (expert opinions "must be relevant to the facts of the case.").

More importantly, by his own admission, Pease is unable to opine as to whether an estimate of 1.3 million or even 1.5 million labor hours to complete Petrodrill rig B-103 would be more or less "reasonable" than the 1.0 million hours to complete actually estimated on the 3-21-00 EACs.[7]  This is significant because the only possible relevance of any testimony regarding the "reasonableness" of the 3-21-00 EACs (as discussed below, E&Y has now also admitted that there is in fact no relevance to even that testimony) would be in relation to the $100 million and higher loss estimates prepared by FGH in December, 1999, after the Halter merger (and later), but never disclosed to the public or E&Y.  The 3-21-00 EACs estimated a total of 2.27 million labor hours (or "manhours") for the entire fabrication of B-103 and estimated 1.0 million hours left "to complete."  *See* Pease Report, Table III. The (undisclosed) December, 1999 estimate for rig B-103 was for a total of 2.54 million labor hours for the entire fabrication.[8]  While the information on hours "to complete" for the December estimate is not available, the difference between the total hours estimated in the 3-21-00 EACs and the December, 1999 estimate was less than 300,000 hours.  (2.54 million - 2.27 million).  Had the 3-21-00 EACs used an estimate of 2.54 million labor hours to complete, like the December, 1999 estimate, instead of the 2.27 million hours used, the 3-21-00 EACs would have estimated (slightly less than) 1.3

---

[7]     Pease admits that, if Bingle, the FGH project manager, had estimated 1.3 million or even 1.5 million labor hours to complete Petrodrill rig B-103, instead of the 1.0 million hours actually estimated for completing rig B-103 on the 3-21-00 EAC, he could not question (and hence, could not testify about) the reasonableness of the estimate.  When asked whether, if Bingle "put 1,300,000 [labor hours on the 3-21-00 EAC for rig B-103], you would believe that would be reasonable?"  Pease admitted that he "wouldn't prepare to argue with it, no."  *See* Pease depo at 234-35; *see id.* at 235 ("A. . . . I'd have to believe the [labor hours] number of the people who put the number together with all he [Bingle] had available, he had the right number.  Q.   So basically you believe that whatever --  Mr. Bingle would have put the right number?  A.   Yes. MR. GORSLINE:  Object to the form."); *see also* discussion in Memo at 16-18.

[8]     *See* Pease Report, Table V (Dec. 8, 1999 Total "manhours" 2,536,846).

million labor hours to complete instead of 1.0 million.  Again, however, Pease admits that he cannot

opine whether 1.3 million (or even 1.5 million) labor hours would be more or less "reasonable" than

1.0 million.  Therefore, Pease is unable to testify as to any (even possibly) relevant issue.

Accordingly, in accordance with *Berhow*, and based upon Pease's own admission, Pease's testimony

should be excluded.

       2.       E&Y Itself Now Admits That Pease's Testimony is Not Relevant

      But there is more.  Travelers sued E&Y for its negligence in performing the audit of FGH's

1999 financial statements.  E&Y too acknowledges that the legal issue raised by Travelers is whether

E&Y was negligent in conducting the audit.[9]  The FGH financial statements in question contained a

reserve for anticipated losses on fixed price construction contracts, including a $60 million loss

estimate relating to Petrodrill.  According to E&Y, it retained Pease to: "**analyze the 3-21-00 EACs**

[construction cost "estimates at completion" prepared by FGH with respect to the Petrodrill project]

**and to determine whether those EACs**, together with the methods FGH used to generate them,

**were reasonable**."  E&Y Response at 3 (emphasis added).   Significantly, however, E&Y admitts

that: "**Whether E&Y was** (or was not) **negligent** in its audit of the Financial Statements ***does not***

***depend*** *__at all__* **on whether the 3-21-00 EACs were** (or were not) **reasonable**."  E&Y Response at

2 (emphasis added).   By admitting both that: (1) Pease's role was to analyze whether the EACs

"were reasonable";  and that (2) E&Y's negligence, does not depend "at all" on whether the EACs

"were reasonable," E&Y effectively admits that the proffered expert testimony by Pease is not

---

     [9]     E&Y first identifies Travelers' reliance and causation as issues then states:
"Assuming arguendo that Travelers can demonstrate both reasonable reliance and proximate
causation . . .  another primary issue will be whether E&Y was negligent in auditing the Financial
Statements."  E&Y Response at 1-2.

relevant.  As a matter of law, expert testimony that is not relevant cannot be admitted. *See Berhow*, 2006 WL 839529, slip op. at *5 (proffered expert testimony "is not relevant and is therefore inadmissible.")  Accordingly, for this further reason, and based upon E&Y's own admission, Pease's testimony should be excluded.

<u>Conclusion</u>

For the foregoing reasons, and based upon the matters discussed in Travelers' Memo and the cited authorities, Plaintiff Travelers respectfully requests the entry of an order precluding the proffered opinions and testimony of Mr. F. Tim Pease.

Respectfully submitted,

Travelers Casualty and Surety Company
Of America, Plaintiff

RODRIGUEZ TRAMONT
  GUERRA & NUÑEZ, P.A.


By:/s/ Frank R. Rodriguez
        COUNSEL OF RECORD

William V. Westbrook, III (MS Bar 7119)
John Paul Barber (MS Bar 1983)
Bryant, Clark, Dukes, Blakeslee,
  Ramsay & Hammond, PLLC
2223 14th Street
P.O. Box 10
Gulfport, Mississippi 39502
Telephone: (228) 863-6101
Facsimile: (228) 868-9077

OF COUNSEL:
Andrew V. Tramont, Esq. (FL Bar 322830)
Frank R. Rodriguez, Esq. (FL Bar348988)
RODRIGUEZ TRAMONT
  GUERRA & NUÑEZ, P.A.

16

2100 Ponce De Leon Boulevard, PH II
Coral Gables, Florida 33134
Telephone: (305) 350-2300
Facsimile: (305) 350-2525
Attorneys for Plaintiff,
Travelers Casualty And
Surety Company of America

**<u>Certificate of Service</u>**

I, Frank R. Rodriguez, attorney for Plaintiff, Travelers Casualty & Surety Co. of America,

do hereby certify that I have this date caused a true and correct copy of the foregoing to be served

upon counsel for Defendant as follows:

<u>VIA U.S. MAIL</u>:

Joseph B. Haynes, Esq.
Michael M. Raeber, Esq.
King & Spalding, LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309-3521

Cheri A. Grosvenor, Esq.
King & Spalding, LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309-3521

Lisa Wolgast, Esq.
King & Spalding, LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309-3521

<u>VIA E-MAIL</u>:

Joseph B. Haynes, Esq. - jhaynes@kslaw.com
Michael M. Raeber, Esq. - mraeber@kslaw.com
Cheri A. Grosvenor, Esq. - cgrosvenor@kslaw.com
Lisa Wolgast, Esq. - lwolgast@kslaw.com

This _____ day of June, 2006.

/s/ Frank R. Rodriguez