SOUTHERN DISTRICT OF MISSISSIPPI
**F I L E D**
OCT 0 1 2008
J.T. NOBLIN, CLERK
By _____ Deputy

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

**F I L E D**
September 8, 2008

_____

No. 07-60379

_____

Charles R. Fulbruge III
Clerk

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, A
Connecticut Corporation

Plaintiff - Appellee

v.

ERNST & YOUNG LLP

Defendant - Appellant

_____

Appeal from the United States District Court
for the Southern District of Mississippi

_____

Before JONES, Chief Judge, DAVIS and GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The district court entered judgment on a jury verdict in favor of Travelers
Casualty and Surety Company of America ("Travelers") and against Ernst &
Young LLP ("E&Y").  E&Y appeals the district court's denial of its motion for
judgment as a matter of law and its motion for new trial.  For the following
reasons, we affirm.

I

In November 1999, Friede Goldman International and Halter Marine
Group, Inc. merged to form Friede Goldman Halter, Inc. ("FGH").  FGH
constructed oil rigs, vessels,  and other large maritime equipment.  Shortly after

the merger, FGH hired E&Y, to audit its 1999 year-end financial statements, and to provide the necessary audit opinion for its 1999 Form 10-K filing with the Securities and Exchange Commission ("SEC"). FGH filed its 1999 10-K with the SEC on March 31, 2000. E&Y's opinion letter, filed as part of the 10-K, stated that it had "conducted [its] audit in accordance with auditing standards generally accepted in the United States," and that it believed that its audit provided a "reasonable basis" for its opinion that the financial statements "present fairly, in all material respects, the consolidated financial position of Friede Goldman Halter, Inc. and Subsidiaries at December 31, 1999." E&Y did not qualify its audit opinion or issue any disclaimers in its opinion letter indicating that it lacked necessary information for its audit. Nor did the opinion letter raise any question as to FGH's viability as a going concern.[1]

FGH's 1999 financial statements disclosed two problematic construction projects for the new corporation: the Ocean Rig and Petrodrill projects. The projects involved the construction of large oil rigs. The company accounted for both projects under the "percentage of completion" method, which required FGH to estimate the total expected revenues and cost for each job, and to recognize any expected periodic revenue or loss based on the percentage of the project that had been completed to that point. The statements included projected losses on Ocean Rig of $37.4 million and $60 million on Petrodrill. While this case concerns both construction projects, the projected loss on the Petrodrill project is of central importance. The financial statements included notes regarding the cause of the loss on the Petrodrill project. According to the notes, problems with

---

[1] For a detailed description of the audit process and the different types of opinions that an auditor may issue, *see* Jay M. Feinman, *Liability of Accountants for Negligent Auditing: Doctrine, Policy, and Ideology*, 31 FLA. ST. U. L. REV. 17, 20-22 (2003). For our purposes it is important to note that an auditor may issue a "qualified opinion," which states that the scope of the audit has been limited, or the auditor is unable to obtain all necessary information, or a "disclaimer opinion," which may be issued if the accountant is unable to reach an informed opinion because of limitations in the audit examination. *See id.* at 21-22.

subcontractors, delays in engineering planning, and contract disputes between an FGH subsidiary and Petrodrill combined to create the anticipated loss of $60 million. The financial statements also provided that "funding these excess costs could have a significant impact on the Company's liquidity." The statements also included forward-looking warnings regarding the uncertainty generally associated with the percentage of completion method, and the fact that loss estimates included in the statements could change in the future.

Because of the size of the construction projects carried out by FGH and the uncertainties attendant in such lengthy projects, FGH was required to obtain surety bonds. A surety bond is a third-party guarantee involving an owner, a contractor, and a surety. The contractor pays a premium for the surety's bond which guarantees the contractor's performance for the owner. If the contractor cannot complete performance, then the surety is obligated to do so. In early May 2000, FGH approached Travelers and several other surety companies seeking an extensive $600 million bond program for future construction contracts. After reviewing FGH's 1999 financial statements, Travelers determined that it could not issue any surety credit to FGH because the company presented too high a risk based on its poor financial outlook. The other companies also declined to issue surety credit.

A few weeks later, FGH again sought to obtain surety bonds from Travelers and other surety companies. At this meeting, FGH promised to revamp its finances and operations such that FGH would be able to bear the anticipated losses from Ocean Rig and Petrodrill. The other surety companies again declined, but Travelers decided to proceed with further discussions.

In June 2000, FGH management indicated to Travelers that FGH's financial situation was improving. FGH outlined a "liquidity campaign" that would involve FGH disposing of assets, selling stock, and obtaining a new line of credit. FGH also anticipated a tax refund. The campaign was a success and

No. 07-60379

provided approximately $200 million in available liquidity for FGH to use to cover any potential losses. The liquidity campaign "dramatically changed" Travelers' impression as to whether it could possibly issue bonds to FGH. Travelers still understood FGH to be a "high risk" surety situation. Nevertheless, Travelers sent a July 2000 memo to FGH tentatively outlining a proposed surety bond program worth between $200-225 million.

In August, FGH issued its unaudited second quarter Form 10-Q, which provided an updated picture of the expected losses on Petrodrill and Ocean Rig. The 10-Q showed that FGH had increased its loss estimate on Ocean Rig by $28.3 million. The 10-Q provided no change in the Petrodrill loss estimate; it remained at $60 million. After this announcement, Travelers met with FGH management on two occasions to address its concerns, especially with respect to whether Petrodrill's loss estimates were likely to change. FGH acknowledged the change in the Ocean Rig project, but assured Travelers that the Petrodrill estimate remained accurate. FGH provided Travelers with an independent, third-party engineering assessment of both projects. That assessment confirmed the accuracy of the percentage of completion estimates to date on Ocean Rig and Petrodrill. FGH also reassured Travelers that the fruits of its liquidity campaign would be able to cover the expected losses on both Ocean Rig and Petrodrill.

In September 2000, Travelers decided to back off of its original $225 million plan and instead issued approximately $70 million in surety bonds to FGH. These bonds were issued primarily for a vessel construction project known as the Pasha project. The bonds also covered two other small contracts.[2] The Pasha bond agreement was not a run-of-the-mill arrangement. Travelers charged a higher bond premium and obtained a special security interest in the

---

[2] While the bond related to three contracts, the opinion adopts the term used by the parties and for convenience refers to this as the Pasha bond.

project.  Travelers also required initial collateral of $15 million, though the agreement provided that half of the collateral would be released once certain security agreements received final sign-off.  Soon thereafter, final sign-off occurred and Travelers released half of the $15 million back to FGH.

In November 2000, FGH's agent again approached Travelers to discuss the original $200-225 million bonding program.  Travelers declined, stating that it wanted to be more certain about the success of the Ocean Rig and Petrodrill projects before issuing any more bonds.

In March 2001, FGH released its year-end 2000 10-K which revealed new, much higher loss estimates.  The new numbers reflected an anticipated loss of $121 million on Petrodrill, double what was reflected in the 1999 10-K, and double what Travelers assumed the loss to be when it issued the Pasha bond. The Ocean Rig estimate also increased dramatically.

Subsequent to issuing the bond, Travelers learned that FGH had diverted somewhere between $17-35 million from the Pasha project towards other work in an attempt to keep the company viable.  This diversion depleted the Pasha project further, and it did not help to keep FGH afloat.  Based on insufficient cash and reserves to cover its losses, FGH filed for bankruptcy shortly after the release of its 2000 10-K.  FGH was unable to continue construction on the projects under the Pasha bond, and Travelers was required to fulfill its obligation as surety.  Travelers paid out approximately $58 million to complete the projects covered by the Pasha bond.

Travelers sued FGH, its officers and directors, as well as E&Y in an attempt to recoup the $58 million it lost as a result of paying out on the Pasha bond.  Travelers alleged that FGH's management had misrepresented FGH's financial position and breached its fiduciary duty towards Travelers during the bond negotiation process.  Travelers alleged that E&Y was negligent in conducting its audit of FGH's 1999 year-end financials.  The FGH officers and

directors settled, leaving E&Y as the only remaining defendant. Travelers' claim against E&Y was tried to a jury.  Travelers alleged that E&Y was negligent in failing to conduct the necessary inquiries and perform proper audit tests to confirm and substantiate the Petrodrill loss estimates in the 1999 10-K, leading to a gross under-estimate of the Petrodrill loss estimate. Travelers contended that E&Y's negligence was a substantial factor in causing Travelers to issue the Pasha bond because the estimated loss on the Petrodrill contract was of central importance to FGH's viability going forward, and Travelers relied on the accuracy of the loss figure in issuing the bond.  The jury found that E&Y was negligent in conducting its audit and that E&Y's negligence proximately caused 25% of Travelers' harm.  In apportioning fault, the jury found FGH 75% at fault and E&Y 25% at fault.  The district court entered judgment against E&Y in the amount of $14,443,210.87.

E&Y filed multiple post-trial motions, including a motion for judgment as a matter of law under FED. R. CIV. P. 50, and a motion for a new trial under FED. R. CIV. P. 50 & 59.  E&Y argued that judgment as a matter of law was proper because the evidence was insufficient to allow a the jury to conclude that: (1) Travelers reasonably relied on the 1999 audited financials in making the decision to issue the Pasha bond in September 2000; or that (2) E&Y's negligence was the proximate cause of Travelers' damage.  E&Y sought a new trial, arguing that the verdict was contrary to the great weight of the evidence with regard to the issues of reasonable reliance and proximate cause.  E&Y also argued that a new trial was necessary because the district court erred in denying its requested jury charges and verdict form which would have allowed the jury to allocate fault to Travelers.  The district court denied E&Y's post-trial motions.  The district court found sufficient evidence to support findings of reasonable reliance and proximate causation.  The district court refused a new trial on the allocation of fault issue, holding that E&Y could not prove Travelers' negligence because E&Y

No. 07-60379

had not offered the necessary expert testimony to establish the applicable standard of care. This appeal ensued.

## II

We review *de novo* the district court's denial of a motion for judgment as a matter of law, applying the same standard as the district court. *See Foradori v. Harris*, 523 F.3d 477, 485 (5th Cir. 2008). After a case has been tried to a jury, a motion under Rule 50 is a challenge to the legal sufficiency of the evidence. *See id.* Because we are wary of upsetting jury verdicts, "[a] jury verdict must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* (internal quotation marks omitted); *see* FED. R. CIV. P. 50(a)(1). "[W]e draw all reasonable inferences and resolve all credibility determinations in the light most favorable to the nonmoving party." *Id.* Accordingly, we will reverse the district court's denial "only if the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict." *Id.*

"Our review of the district court's denial of a motion for a new trial is more deferential than our review of a motion for judgment as a matter of law. We will reverse the trial court's denial of a motion for a new trial only when there is a clear showing of an abuse of discretion." *Id.* at 497.

In reviewing the district court's rulings in this diversity case, we apply the substantive law of Mississippi. *See Erie v. Tompkins*, 304 U.S. 64, 78-79 (1938).

## III

E&Y raises three issues on appeal, two challenges to the sufficiency of the evidence supporting the jury's verdict and one challenge to the district court's jury instructions. First, E&Y argues that the evidence was insufficient for a rational jury to conclude that Travelers reasonably relied on the 1999 financials prepared by E&Y—specifically the $60 million Petrodrill loss figure—when Travelers issued the Pasha bond in September 2000. Second, conceding that it

No. 07-60379

was negligent in conducting its audit, E&Y argues that the evidence was insufficient for a reasonable jury to find that its negligence proximately caused Travelers' harm. Third, with respect to the jury instructions, E&Y argues that the district court reversibly erred in preventing the jury from apportioning fault to Travelers. We consider and reject each of these arguments in turn.

## A

We first conclude that E&Y has not overcome the high hurdle of establishing that the evidence presented in this case, when viewed in the light most favorable to Travelers, was insufficient for a rational jury to conclude that Travelers reasonably relied on the 1999 financials and, specifically, the Petrodrill loss estimate. There is no dispute that Travelers relied on the 1999 financials, and that E&Y was negligent in auditing those financials. Rather, E&Y's challenge focuses exclusively on the "reasonableness" of Travelers' reliance.

Mississippi courts have provided no guidance as to the specific point at which a plaintiff's reliance on negligent misrepresentations in audited financial statements becomes unreasonable as a matter of law.[3] When state law provides no definitive answers to the question presented, we must make an educated

---

[3] In the seminal Mississippi case establishing the scope of an auditor's duty toward third parties, *Touche Ross & Co. v. Comm. Union Insur. Co.*, 514 So. 2d 315 (Miss. 1987), the Mississippi Supreme Court held that "an independent auditor is liable to reasonably foreseeable users of [its] audit, who request and receive a financial statement from the audited entity for a proper business purpose, and who then detrimentally rely on the financial statement, suffering a loss, proximately caused by the auditor's negligence." *Id.* at 322. We could find no Mississippi case since dealing with an auditor's liability in negligence to third parties. We note that the *Touche Ross* case does not, by its express terms, include a "reasonable reliance" requirement. Nevertheless, neither party objected to the district court's jury instruction on reasonableness, and neither party has raised an issue with the reasonableness requirement on appeal. At any rate, for the reasons explained in the text, we have no doubt that the Mississippi Supreme Court would place a limit on the extent to which a third party can rely on negligent misrepresentations in audited financial statements—this is true whether that limitation is called reasonableness of reliance, or whether the limit is imposed in *Touche Ross* terms, by limiting the scope of those third-party users who constitute "reasonably foreseeable" users of an audit. In this opinion, we speak in terms of reasonable reliance, as that is how the district court and the parties have presented the matter to us.

8

"*Erie* guess" as to how the Mississippi Supreme Court would resolve the issue. *See Leonard v. Nationwide Mut. Ins. Co.*, 499 F.3d 419, 431 (5th Cir. 2007). "In making an *Erie* guess, we defer to intermediate state appellate court decisions, 'unless convinced by other persuasive data that the highest court of the state would decide otherwise,'" *Herrmann Holdings Ltd. v. Lucent Tech., Inc.*, 302 F.3d 552, 558 (5th Cir. 2002), and "we may consult a variety of sources, including the general rule on the issue, decisions from other jurisdictions, and general policy concerns." *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 249 (5th Cir. 2008).

While Mississippi courts have not considered the allowable scope of reasonable reliance in the context of financial statements, analogous Mississippi cases make clear that a party cannot reasonably rely on a misstatement when the error is obvious to the party or the party knows the truth of the matter. *See Waters v. Allegue*, 980 So. 2d 314, 318 (Miss. Ct. App. 2008) (holding that home buyers could not, as a matter of law, reasonably rely on real estate agent's representation as to square footage of home when buyers knew the representation to be inaccurate); *cf. Little v. Miller*, 909 So. 2d 1256, 1260 (Miss. Ct. App. 2007) (affirming summary judgment because plaintiff-buyer could not prove that he relied on a misrepresentation of defendant-seller concerning drainage problems on property when plaintiff was "well aware of the problems . . . and only completed the purchase after making their own observations.") This rule is ubiquitous and appears in a host of other contexts where a plaintiff's recovery depends on the plaintiff's reasonable or justifiable reliance on a defendant's misrepresentation. *See Tom Hughes Marine, Inc. v Am. Honda Motor Co., Inc.*, 219 F.3d 321, 326 (4th Cir. 2000) ("There can be no reasonable reliance on a misstatement if the plaintiff knows the truth of the matter.") (applying South Carolina law of negligent misrepresentation); *see also In re Mercer*, 246 F.3d 391, 416 n. 33 (5th Cir. 2001) ("An investor cannot close his eyes to a known risk. If the investor possesses information sufficient to call

the representation into question, he cannot claim later that he relied on or was deceived by the lie." (quoting *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 676 (7th Cir. 1995)); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 181 (3d Cir. 2000) (holding that securities fraud plaintiffs could not prove reasonable reliance on financial statements after they were informed that the statements contained accounting irregularities); RESTATEMENT (SECOND) OF TORTS § 541 (1977) ("The recipient of a fraudulent misrepresentation is not justified in relying on its truth if he knows that it is false or its falsity is obvious to him."). While it has not yet had the opportunity to do so, we have no doubt that the Mississippi Supreme Court would apply a similar principle in this context to prevent a plaintiff from recovering when her loss stems from reliance on apparent or known inaccuracies in a financial statement. *Cf. Touche Ross*, 514 So. 2d at 322 (noting that imposing upon auditors a negligence duty towards third parties was not intended to turn auditors into guarantors of a financial statement's content). Based on the above, we believe the Mississippi Supreme Court would analyze the reasonableness of Travelers' reliance by looking at the extent of Travelers' knowledge that the Petrodrill loss estimate was no longer accurate at the time Travelers relied on the estimate in issuing the Pasha bond. The more obvious the inaccuracy of the Petrodrill estimate, and the more information Travelers had suggestive of inaccuracy, the more likely it is that Travelers reliance was unreasonable as a matter of law.

As the jury already found Travelers' reliance to have been reasonable, we ask only whether, when taking the evidence and all reasonable inferences in favor of Travelers, the jury made a rational finding of reasonableness. Under this deferential standard applied to our review of jury verdicts, we believe that there was sufficient evidence to support a finding of reasonable reliance. Travelers' underwriter Fred Schwait testified that underwriters typically rely on audited financial statements until those statements are superseded by the

next set of audited financial statements. The other main Travelers' underwriter working on the Pasha bond was Michael Pete. Both he and Schwait testified that all of the post-audit information they received on the Petrodrill estimate echoed the same $60 million number from the 1999 audited financials. The second-quarter 10-Q that informed Travelers of the $28 million increase in loss on Ocean Rig continued to reflect the same $60 million loss estimate for Petrodrill. After Travelers raised concern over the $28 million increase on Ocean Rig and whether Petrodrill might also suffer an increase, FGH provided Travelers with an independent engineering report confirming FGH's percentage of completion estimates for both Petrodrill and Ocean Rig. Also, an internal E&Y memo dated June 30, 2000 reflected the $28 million increase in Ocean Rig but stated that E&Y's audit team believed there remained a reasonable basis for the $60 million loss estimate on Petrodrill. While Travelers did not see or rely upon this memo, the jury was free to assess the reasonableness of Travelers' reliance with the knowledge that E&Y's accountants still believed the $60 million Petrodrill estimate to have a reasonable accounting basis on June 30. Finally, the jury had before it the expert report of George Beuttner.[4] Beuttner's report stated that Travelers' reliance on the 1999 financial statements, along with the new information provided by FGH, was "well within accepted and expected surety underwriting standards."

To depict Travelers' reliance as unreasonable, E&Y argues that Travelers knew that the loss number on the Petrodrill project had already deteriorated to $60 million in a short period of time. E&Y points out that Travelers knew that the estimate could change. E&Y also states that Travelers knew that, in the second quarter of 2000, FGH increased by $28 million its loss estimate on Ocean Rig. According to E&Y, this drastic change in Ocean Rig should have made it

---

[4] Travelers retained Beuttner as an expert in the field of surety underwriting. He was never called to testify at trial. However, his expert report was admitted into evidence by E&Y.

No. 07-60379

clear that it was unreasonable to rely on the Pertodrill figures in the 1999 financial statement.

While the change in Ocean Rig and the other facts pointed out by E&Y raise questions as to the wisdom of Travelers' continued reliance on the Petrodrill estimate in the 1999 financials, we are not free to substitute our own judgment for that of the jury. Rather, we are limited to determining whether the jury's verdict was rational in light of the evidence presented. Faced with conflicting evidence on the issue of whether Travelers' reliance was reasonable, the jury made a rational finding based on the evidence that it was. We conclude that the evidence was sufficient such that a rational jury could find that Travelers reasonably relied on the audited financial statements, and specifically the Petrodrill loss estimate, when deciding to issue the Pasha bond.

B

E&Y's argument that the evidence was insufficient for a rational jury to find that its negligent audit proximately caused Travelers financial harm also fails. "In order for an act of negligence to proximately cause the [plaintiff's] damage, the fact finder must find that the negligence was both the cause in fact and legal cause of the damage." *Glover v. Jackson St. Univ.*, 968 So. 2d 1267, 1277 (Miss. 2007). To be held liable, a defendant's negligence "need not be the sole cause of an injury," *Foster v. Bass*, 575 So. 2d 967, 992 (Miss. 1990), but the defendant's negligence must be a "substantial factor in producing the injury." *New Orleans & N. E. R. Co. v. Burge*, 2 So. 2d 825, 826 (Miss. 1941); *see Ogburn v. City of Wiggins*, 919 So. 2d 85, 91 (Miss. App. 2005). Still, a negligent defendant may be shielded from liability if a superseding cause is found—"[a] superseding cause is an act of a third person or other force which by its intervention prevents the [defendant] from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." *Southland Management Co. v. Brown*, 730 So. 2d 43, 46 (Miss. 1998) (quoting

No. 07-60379

Restatement (Second) of Torts § 440 (1965)).

After hearing the evidence, the jury found that E&Y's negligent audit proximately caused Travelers' harm, apportioning 25% of the fault to E&Y. Viewing the evidence in the light most favorable to Travelers, we cannot conclude that the jury was unreasonable in finding that E&Y's audit proximately caused 25% of Travelers' harm.

1

E&Y first contends that its negligent audit was not a cause in fact of Travelers' decision to issue the bonds. E&Y argues that Travelers failed to prove causation because it provided insufficient evidence that the Petrodrill loss estimate should have been higher than $60 million as of December 31, 1999. In order to prove that the Petrodrill loss estimate should have been much higher, Travelers admitted into evidence two internal FGH documents that estimated the cost to complete the Petrodrill project, one from December 1999 and one from March 2000—these two documents provided loss estimates for Petrodrill in the $100-110 million range. Still, E&Y focuses on Travelers' accounting expert, Mark Murovitz, who testified that he was unable to reconstruct what the loss number in the 1999 financials should have been. Even accepting, *arguendo*, E&Y's position that Travelers did not provide sufficient evidence as to what the estimate should have been in December 1999, the inability of Murovitz to attest to a higher estimate does not undermine the jury's conclusion that E&Y's negligence was a substantial factor in causing Travelers' loss. Murovitz testified that E&Y failed to subscribe to the applicable standard of care because no loss estimate should, or could, have been verified for Petrodrill. Murovitz also testified that E&Y breached the applicable standard of care by failing to obtain necessary documentation to support the Petrodrill estimate. Murovitz testified that the applicable accounting standards required an auditor to obtain sufficient evidentiary matter to ensure the validity of the figures presented in a company's

No. 07-60379

financial statements. Based on E&Y's failure to conduct interviews with FGH employees closely associated with the Petrodrill project, holes in E&Y's paperwork associated with the Petrodrill project, and the engineering problems facing the Petrodrill project, Murovitz stated that E&Y could not have determined whether *any* Petrodrill estimate was reasonable. According to Murovitz, to comply with the applicable standard of care, E&Y should have admitted that it did not have enough information to determine the reasonableness of the Petrodrill loss estimate or that E&Y did not determine the reasonableness of the loss estimate. Both Schwait and Pete testified that Travelers requires a "clean" or "unqualified" audit before issuing a bond, and that the Pasha bond would never have been issued if E&Y's audit opinion reflected any qualification, or if E&Y had indicated that there was no reasonable accounting basis for the $60 million Petrodrill loss estimate.

E&Y next points to two events that it claims sever the causal chain between its negligence and Travelers' decision to bond. First, E&Y argues that Travelers initially declined to issue any bonds to FGH based on the 1999 financials. According to E&Y, the only decision by Travelers "based on" the 1999 financials was to deny coverage in May. E&Y insists that it was Travelers' independent judgment in response to FGH's representations that led to Travelers' later decision to bond the Pasha project in September. According to E&Y, Travelers' decision to decline bonds in May, and its later reliance on FGH's representations both served to break the chain of causation between E&Y's negligence and the bond decision.[5]

---

[5] E&Y analogizes to the Mississippi case of *Sample v. Haga*, 824 So. 2d 627 (Miss. Ct. App. 2001). *Sample* involved two decedents, Sample and Williams, who died in a house fire. Both escaped the house at different times but then re-entered the house to look for each other. The plaintiffs alleged that Sample and Williams died because of the landlord's failure to install smoke detectors. *See id.* at 629-30. The Mississippi Court of Appeals granted summary judgment in favor of the landlord on this issue holding that, "the cause-in-fact of the deaths of Sample and Williams was the voluntary act of each in re-entering the house in an attempt to find the other." *Id.* at 632.

We find unpersuasive E&Y's comparison between the *Sample* case and the facts before us.

E&Y's claim that the only decision "based on" the negligently audited financials was the May declination ignores the trial testimony of Pete and Schwait indicating that Travelers continued to rely on the audited financials up until it issued the Pasha bond.   And even if Travelers also relied upon representations from FGH management, this would not necessarily prevent E&Y's negligent audit from being a cause in fact of Travelers' harm.  *See Entrican v. Ming*, 962 So. 2d 28, 32 (Miss. 2007)(noting that  a defendant's negligence need not be the sole cause of injury to be considered a proximate cause).   Travelers' underwriters testified that had they known that no reasonable loss estimate could be generated for Petrodrill (*i.e.*, absent E&Y's negligence), they would not have issued the Pasha bond, even taking into account the positive developments from FGH's liquidity campaign. The jury was free to believe this testimony and thus reasonably conclude that E&Y's negligent audit was a cause in fact of Travelers' decision to issue the bond.

2

Next,   E&Y   argues   that   FGH's   lobbying   campaign   and   later misrepresentations made by FGH management were a superseding cause of Travelers' decision to issue the Pasha bonds.[6]  In describing the superseding

---

Travelers' continued reasonable reliance on the negligently audited financial statements distinguishes *Sample*, where the lack of smoke detectors played no causal role in Sample's and Williams' decision to re-enter the house.  While the 1999 financial statements' depiction of FGH's financial status may have led Travelers to a "place of safety" in May, this does not preclude E&Y's negligent audit from later leading Travelers back into the burning house in September.  Moreover, E&Y's negligence could be said to mask the danger presented upon re-entry.

[6] E&Y also argues that Travelers' decision to reverse course and issue the Pasha bond in September 2000 was "unforeseeable."  While this argument is placed under the heading "proximate cause," the argument simply attacks the wisdom of Travelers' decision to issue the Pasha bond.  For example, E&Y states that "no one could have foreseen that *a reasonable surety would do what Travelers did here*." (emphasis added).   E&Y then points out that "Travelers knew well that [FGH] had poor operating results, fragile capital structure, small liquidity ratio, inept management, and a low rating by Moody's and S&P."  In the proximate cause context, the proper foreseeability inquiry is whether "the plaintiff's injuries and damages fall within a particular kind or class of injury or harm which reasonably could be expected to flow from the defendant's negligence." *Glover*, 968 So. 2d at 1278-79.  What E&Y labels the "foreseeability" of Travelers' bond decision is nothing more than an argument that Travelers

cause doctrine, the Mississippi Supreme Court has stated, "an original actor's negligence may be superceded by a subsequent actor's negligence, if the subsequent negligence was unforeseeable." *Entrican*, 962 So. 2d at 35. However, "if an antecedent negligent act puts in motion an agency which continues in operation until an injury occurs it would appear to be more like a second proximate cause than a remote and unactionable cause." *Eckman v. Moore*, 876 So. 2d 975, 981 (Miss. 2004). Put another way, "[t]he question is, did the facts constitute a succession of events so linked together as to make a natural whole, or was there some new and independent cause intervening between the alleged wrong and the injury?" *Miss. City Lines v. Bullock*, 13 So. 2d 34, 36 (Miss. 1943). Perhaps recognizing the difficulty of applying the above formulations to reach a conclusion as a matter of law, the Mississippi Supreme Court has stated that "the question of superceding intervening cause is so inextricably tied to causation, it is *difficult to imagine a circumstance* where such issue would not be one for the trier of fact." *O'Cain v. Harvey Freeman & Sons, Inc.*, 603 So. 2d 824, 830 (Miss. 1991) (emphasis added). E&Y contends that this case constitutes a "difficult to imagine . . . circumstance" where the superseding nature of FGH's intervening actions may be decided as a legal matter. We disagree.

To support its superseding cause argument, E&Y attempts to analogize the facts presented here to the *Touche Ross* case. In *Touche Ross*, Commercial Union Insurance Company, relying on a Touche Ross audit opinion, provided a bank with insurance coverage against employee fraud. *Touche Ross*, 514 So. 2d at 315. The bank eventually failed because the bank's president engaged in fraud. Relying on § 448 of the Restatement, the Supreme Court held that the bank president's "criminal conduct" was a "remote possibility" that Touche Ross

---

should be held at fault because it made a poor decision by issuing the Pasha bond. We address the issue of Travelers' fault in Part IV, *infra*.

was not required to anticipate. *Id.* at 323-24 (noting that "absent special circumstances" criminal conduct qualifies as a superseding cause). According to the court, "[t]o hold Touche Ross liable for losses, stemming from criminal conduct which began four months after completion of the audit, based solely upon the accounting firm's alleged negligence during the time of its preparation, is too remote for the imposition of liability." *Id.* at 324. The court also recognized that no failing of Touche Ross's led to the bank president's committing fraud. *See id.* Because the bank president's fraud was a superseding cause of Commercial Union's loss, the Court rendered judgment in favor of Touche Ross. *See id.* at 325.

In an attempt to liken itself to the auditors in *Touche Ross*, E&Y argues that its negligent acts were long complete by the time Travelers capitulated to FGH and issued the Pasha bonds. But while E&Y's auditing failures actually occurred in March of 2000, the causal impact of E&Y's negligence only arose once Travelers relied on the negligent audit. The jury concluded that Travelers continued to reasonably rely on E&Y's negligent audit up until the Pasha bond decision was made. Thus, while FGH's representations and inducements to Travelers occurred over a period of time after the audit took place, the jury effectively determined that E&Y's negligence operated concurrently with the inducements of FGH's management in causing Travelers to issue the Pasha bond, rather than FGH's representations acting as a superseding cause. This is consistent with the testimony of Pete and Schwait that they simultaneously relied on the accuracy of the $60 million Petrodrill estimate along with the representations as to FGH's improved financial status in deciding to issue the bond. And in contrast to *Touche Ross*, where due care on the part of the auditor could in no way have prevented the bank president's fraud, the evidence presented at trial provided a sufficient basis for the jury to conclude that had E&Y exercised due care with respect to its audit, then Travelers would not have

issued the Pasha bond.[7]

Finally, based on the evidence at trial, the jury could have reasonably concluded that E&Y's negligence played a role in enabling some of FGH's intervening representations. *See Southland Mgmt. Co. v. Brown*, 730 So. 2d 43, 46-47 (Miss. 1999) (examining, as part of a superseding cause analysis, whether the intervening force operates *independently* of the original negligence). For example, one reason FGH was able to claim that its liquidity campaign was sufficient to cover its estimated losses was because it could point back to E&Y's negligent audit that attested to the accuracy of the Petrodrill loss figure. As Schwait and Pete testified, when FGH continued to tell them that the Petrodrill loss estimate was $60 million, the underwriters relied on the fact that the figure had been tested and found by E&Y to have a reasonable accounting basis in the 1999 financials.

At this stage, the only question we ask is whether there is evidence sufficient such that a reasonable jury could have reached the conclusion reached by this jury as to the lack of a superseding cause. While the FGH liquidity campaign and the representations of FGH management came after the audit, and played an undeniable role in causing Travelers to issue the Pasha bond, the jury could have reasonably concluded that the intervening acts of FGH's management did not sever the causal chain between Travelers' harm and E&Y's negligent audit. Accordingly, the evidence does not justify our reversing the jury's conclusion on this issue that the Mississippi Supreme Court has held to be uniquely within the province of the fact finder. *See O'Cain*, 603 So. 2d at 830. In conclusion, we find that there was sufficient evidence to support the jury's finding that E&Y's negligence proximately caused 25% of Travelers' harm

---

[7] We also note that while the jury eventually attributed fault to FGH, unlike the bank president in *Touche Ross*, there is no indication that the representations made by FGH management were intentionally false, or that they could give rise to criminal liability so as to trigger an analysis under § 448 of the Restatement.

No. 07-60379

that resulted from issuance of the Pasha bond. As such, the district court properly denied E&Y's motion for judgment as a matter of law on this ground.

## C

E&Y contends that the jury's verdict as to liability, specifically with regards to reasonable reliance and proximate causation, was against the great weight of the evidence and that a new trial is warranted. As noted above, our review of the district court's denial of a motion for a new trial is more deferential than our review of a motion for judgment as a matter of law. *See Foradori*, 523 F.3d at 497. In this context, an abuse of discretion can be shown only if there is an absolute absence of evidence to support the jury's verdict. *See id*. As we have already concluded that the jury's verdict was sufficiently supported to survive E&Y's motion for judgment as a matter of law, we necessarily find that the district court did not abuse its discretion in denying the motion for new trial on these grounds. *See id*.

## IV

E&Y argues that it should be entitled to a new trial because the district court erred in its jury charge and verdict form in that the jury was not allowed to assign fault to Travelers.[8] Pursuant to MISS. CODE ANN. § 85-5-7, E&Y contends that the jury should have been able to assign fault to Travelers for issuing the Pasha bond under such risky circumstances and therefore causing its own loss.

In a diversity case, "the substance of jury charges is governed by state law, but the form or manner of giving instructions is controlled by federal law." *Broad. Satellite Int'l, Inc. v. Nat'l Digital Television Ctr., Inc.,* 323 F.3d 339, 347 (5th Cir. 2003). Our review of the jury charge and the verdict form are governed by an abuse of discretion standard. *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d

---

[8] The jury interrogatory for allocation of fault provided for allocation to FGH and to E&Y, but did not provide for fault allocation to Travelers.

131, 153 (5th Cir. 2004). Because district courts have substantial latitude in crafting jury instructions, "the district court's refusal to give a requested jury instruction constitutes reversible error only if the instruction 1) was a substantially correct statement of the law, 2) was not substantially covered in the charge as a whole, and 3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the [party's] ability to present a given [claim]." *Kanida v. Gulf Coast Medical Personnel LP*, 363 F.3d 568, 578 (5th Cir. 2004) (internal quotation marks omitted, alterations in original). The first question is whether E&Y's requested instruction and interrogatory allowing allocation of fault to Travelers represented a correct statement of Mississippi law.

The applicable version of MISS. CODE. ANN. § 85-5-7 provides:

(1) As used in this section, "fault" means an act or omission of a person which is a proximate cause of . . . economic injury, including, but not limited to, negligence, malpractice, strict liability, absolute liability or failure to warn. "Fault" shall not include any tort which results from an act or omission committed with a specific wrongful intent.
. . .
(7) In actions involving joint tort-feasors, the trier of fact shall determine the percentage of fault for each party alleged to be at fault.

MISS. CODE. ANN. § 85-5-7 (reflecting amendments effective Jan 1, 2003 as reported in 2003 Miss. Laws 1290; 3d. Ex. Sess., ch. 4, § 3). Section 85-5-7 is an affirmative defense; the defendant bears the burden of providing proof sufficient to establish fault attributable to a third party. *See Eckman v. Moore*, 876 So. 2d 975, 989 (Miss. 2004). E&Y claims that it provided evidence sufficient to prove Travelers was at fault for its own injury by showing that: (1) Travelers "assumed the risk" associated with bonding the Pasha project, thus causing a portion of its own loss; (2) Travelers was negligent in bonding the Pasha project; or (3) Travelers was at "fault" because it committed acts or omissions which were the

proximate cause of its own loss.

## A

E&Y contends that Travelers should be held at fault because it "assumed the risk" associated with bonding the Pasha project by making a decision to proceed with a "high risk surety" situation.[9] To prove assumption of the risk, the defendant must show that the injured party had subjective knowledge of a specific risk posed by a dangerous condition, that the plaintiff appreciated the danger associated with that risk, and then deliberately and voluntarily chose to expose herself to the risk. *See Huffman v. Walker Jones Equip. Co., Inc.*, 658 So. 2d 871, 873-74 (Miss. 1995); *Shurley v. Hoskins*, 271 So. 2d 439, 443 (Miss. 1973). We find suspect E&Y's implication that bonding a "high risk" company constitutes a "dangerous condition," as no Mississippi case contemplates applying  assumption of the risk to a plaintiff's "risky" business decision. Moreover,  E&Y submitted no evidence to suggest that Travelers had any knowledge of E&Y's negligent audit of the 1999 financials, which was a critical component adding to the risk involved in bonding the Pasha project. Accordingly, Travelers could not have fully appreciated or voluntarily assumed

---

[9] In *Churchill v. Pearl River Basin Dev. Dist.*, 757 So. 2d 940 (Miss 1999), the Mississippi Supreme Court subsumed the traditional doctrine of assumption of the risk into its comparative negligence doctrine:

> We take this opportunity to hold once again that the assumption of risk doctrine is subsumed into comparative negligence. Any actions which might constitute an assumption of risk should be dealt with only in the context of the comparative negligence doctrine. A jury is always free to decide that an act which constitutes an assumption of risk was the sole proximate cause of a plaintiff's injuries. We see no reason why acts which might constitute an assumption of risk should, as a matter of law, create a complete bar to recovery. The comparative negligence doctrine gives juries great flexibility in reaching a verdict. Any fault on the part of the plaintiff should be considered only in the context of comparative negligence.

*Churchill*, 757 So. 2d at 943-44.  In *Churchill*, the Mississippi Supreme Court obviously did away with assumption of the risk as a complete bar to a plaintiff's recovery.  However, the court recognized that an "act" may still constitute an "assumption of risk."  Accordingly, we do not think the opinion meant to do away with the concept of assumption of the risk as a distinct form of fault, that is the idea of proving a plaintiff to be at fault for voluntarily assuming a subjectively known risk as opposed to merely failing to take reasonable precaution (*i.e.*, negligence).

the complete risk of its decision to bond the Pasha project.  As such, we do not believe that Travelers can have its recovery reduced based on an assumption of risk theory.

B

We turn next to E&Y's argument that it provided sufficient evidence for a jury to allocate fault to Travelers based on Travelers' negligence.  Mississippi is a "pure comparative negligence state," *Coho Res., Inc. v. Chapman*, 913 So. 2d 899, 911 (Miss. 2005), and Mississippi law provides for reduction of damages "in proportion to the amount of negligence attributable to the person injured."  *See* MISS. CODE. ANN. § 11-7-15.  A party is entitled to have the jury instructed as to genuine issues of material fact regarding a plaintiff's comparative negligence. *See Hill v. Dunaway*, 487 So. 2d 807, 809 (Miss. 1986).  The district court refused to provide for allocation of fault to Travelers based on negligence because E&Y had not presented expert testimony to establish the requisite standard of care that a surety should exercise under the applicable circumstances.  E&Y first claims that expert testimony was unnecessary.

"The general rule in Mississippi is that expert testimony is not required where the facts surrounding the alleged negligence are easily comprehensible to a jury." *Wal-Mart Stores v. Johnson*, 807 So. 2d 382, 388 (Miss. 2001).  However, "[e]xpert testimony is required to support an action for malpractice of a professional man in those situations where special skills, knowledge, experience, learning or the like are required." *Lovett v. Bradford*, 676 So. 2d 893, 895 (Miss. 1996).  E&Y argues that Travelers' negligence is clear to a layman without the need for expert testimony because Travelers issued a $70 million bond in the face of heavy risk, failed to consult E&Y when circumstances changed, failed to require segregation of funds for the Pasha project, and failed to obtain sufficient collateral for the bond.  Also, E&Y points out that Travelers' own risk assessment system ("CSAMS") scored FGH at a "100," the highest, and riskiest

score available. However, Travelers' underwriters testified that it was not part of the normal course of bond issuance to request an interim audit or to require segregation of funds by a contractor. Travelers' underwriters also indicated that taking a security interest in the Pasha project represented an extra precaution rather than failure to exercise due care. Finally, Schwait testified that Travelers had 139 bond accounts with a CSAMS score of 100, and that it was not unusual for Travelers to bond a company with such a score. While, after the fact, it is easy to see that Travelers made a bad business decision in bonding the Pasha project, this does not mean that the evidence showed that decision to be so obviously unreasonable that a layman could deem Travelers negligent.

In *Lovett*, the Mississippi Supreme Court found that a jury did not need expert testimony to find an insurance agent negligent in completing his client's fire insurance application. *See Lovett*, 676 So. 2d at 895. However, the Court distinguished the uncomplicated case before it from potentially more complex negligence cases involving issues such as "underwriting or actuarial tables or anything so complicated as to necessitate the testimony of an expert witness." *Id*. This case fits into those distinguished from the simple case in *Lovett*: it involves underwriting decisions related to the issuance of large-scale surety bonds. The numerous exhibits submitted at trial reflect the complex nature of the financial calculations and risk analysis that Travelers carried out over the four months during which it evaluated its decision to bond FGH. Because Travelers' bond decision required its professionals to exercise "special skill, knowledge, experience, [or] learning" in a complex factual scenario likely unfamiliar to a lay juror, the district court did not err in requiring E&Y to present expert testimony to establish whether a reasonable surety would have acted as Travelers did in this case. *Cf. Battenfeld of Am. Holding Co., Inc. v. Baird, Kurtz & Dobson*, 60 F. Supp. 2d 1189, 1211 (D. Kan 1999) (holding that, in a case about "complex business practices" of corporate buyers, "a jury is not

No. 07-60379

in a position to determine how much diligence is due without the assistance of . . . an expert witness"); *Smith v. Gilmore Mem'l Hosp., Inc.*, 952 So. 2d 177, 181 (Miss. 2007) (refusing to apply "layman's exception" to rule requiring expert testimony in medical malpractice case because the situation "involv[ed] judgment calls made by professionals").

E&Y contends that if expert testimony was required then it provided the necessary expert testimony to show that Travelers' conduct unreasonably deviated from the applicable standard of care. E&Y points to testimony from Robert Davidson, one of its experts in the field of auditing. Davidson testified that he had never heard of a surety company issuing a $70 million bond to a company with "ratios" like those reflected in FGH's 1999 year-end financials. However, the district court specifically recognized that Davidson was not offered as an expert as to surety underwriting, and that he could not testify as to the reasonableness of Travelers' bond decision. Accordingly, Davidson could not provide the necessary expert testimony to establish Travelers' negligence. *See City of Jackson v. Estate of Stewart*, 908 So. 2d 703, 716 (Miss. 2005) (noting that an expert's testimony should be confined to the expert's area of expertise and holding that a trial judge abuses his discretion in allowing an expert to testify outside his proffered area of expertise).

E&Y next contends that Travelers' own underwriter, Pete, provided testimony establishing that Travelers failed to exercise reasonable care when issuing the Pasha bond. *See Dickey v. Baptist Mem'l Hosp. - N. Miss.*, 146 F.3d 262, 265 (5th Cir. 1998) (noting that a medical malpractice defendant's testimony may be a source of proof of a breach of the standard of care where the witness testifies "in such a clear way that the plaintiff has little trouble demonstrating a deviation from that standard"); *Meena v. Wilburn*, 603 So. 2d 866, 870 n. 9 (Miss. 1992) (same). E&Y specifically refers to a statement from Pete's testimony where he said that he "knew that Friede Goldman Halter was

24

outside of any box that Travelers or Reliance or any other surety would want." This single statement does not establish that Travelers failed to act as a reasonable surety in deciding to issue the Pasha bond. The context of Pete's testimony does not provide a clear picture of when he felt that FGH was "outside of any box." Upon first review of FGH's financials, Pete admitted that he felt FGH had "serious problems." But both Pete and Schwait testified that they became more comfortable with issuing bonds to FGH as FGH's liquidity campaign began to pick up steam. And when FGH eventually secured the extra $200 million in available liquidity, Pete and Schwait made the decision to issue the Pasha bond. The single statement identified suggests that, at some point in time, Pete saw FGH as an undesirable company to bond. But interpreting the statement as an admission of negligence would run counter to Pete's testimony as a whole, which indicated that the decision to bond the Pasha project was justified based on the positive developments in FGH's finances between May and September. Accordingly, we do not believe that Pete's "outside of any box" statement constitutes an admission that Travelers acted unreasonably in issuing the bond for the Pasha project. *Cf. Meena*, 603 So. 2d at 870 (recognizing that the defendant continually admitted to breach of a duty to which he was bound). The district court did not err in concluding that E&Y failed to provide necessary expert testimony necessary to prove Travelers' professional negligence.

C

Finally, we address E&Y's argument that it only need show Travelers to have been at "fault"—not necessarily that Travelers was guilty of assumption of the risk or negligence. E&Y focuses on the terms of the statute, and argues that fault is defined broadly as any "act or omission of a person which is a proximate cause" of the plaintiff's injury. Travelers' responds that the statute only applies to "joint tort-feasors," and that to be considered a "tort-feasor," a party must be shown to be at least negligent. While no Mississippi court has

25

addressed the definition of fault in § 85-5-7 as applied to plaintiffs, lower Mississippi courts have sided with Travelers with regard to non-plaintiffs, recognizing that a party's act or omission will not justify allocation of fault unless the party could be found, at least, negligent.[10]  Moreover, interpreting § 85-5-7 to allow a plaintiff's recovery to be reduced by "fault" that does not amount to negligence would lead to a conflict with the longstanding statutory source of Mississippi's comparative negligence regime.  *See* MISS. CODE. ANN. § 11-7-15 (providing for reduction to plaintiff's recovery "in proportion to the amount of *negligence* attributable" to the plaintiff (emphasis added)).  E&Y points to no Mississippi case allowing a plaintiff's recovery to be reduced by conduct that is less than negligent.  Nor does E&Y provide any principled line that could be drawn to measure "fault" that is less than negligent.  While the Mississippi Supreme Court has not addressed the specific question of the breadth of "fault" under § 85-5-7, in making an *Erie* guess, we predict that it would not require a jury instruction or verdict form allowing for fault allocation to a plaintiff unless the jury has before it facts that would allow the jury to find the plaintiff negligent in contributing to her own injury.

In sum, E&Y did not offer evidence sufficient to show that Travelers assumed the risk of a known danger.  As to negligence, the district court did not

---

[10] *See  Int'l Paper Co. v. Townsend*, 961 So. 2d 741, 763 (Miss. Ct. App. 2007) (holding that trial court did not err in refusing to allow apportionment of fault to a defendant against whom plaintiff had not made out a *prima facie* case of negligence); *Jackson Pub. Sch. Dist. v. Smith*, 875 So. 2d 1100, 1103 (Miss. Ct. App. 2004) (holding that trial court did not err in failing to allocate fault to the plaintiff's mother under § 85-5-7 when trial court had correctly found that mother was not negligent, and thus not a "tort-feasor"); *Miss. Dep't of Transp. v. Trosclair*, 851 So. 2d 408, 417 (Miss. App. 2003 (finding that trial court erred in not allocating fault to a negligent plaintiff) ("Those who are negligent and proximately contribute to an injury should be allocated a percentage of fault." (citing MISS. CODE ANN. § 85-5-7(Rev. 1999)); *cf. Pearl Pub. Sch. Dist. v. Groner*, 784 So. 2d 911, 916 (Miss. 2001) (instructing trial court on remand to apportion fault "to the extent that any of these other tort-feasors is deemed to have been negligent thereby contributing to [plaintiff's] injury and damages"); *see also Cooper Indus. v. Tarmac Roofing Sys., Inc.*, 276 F.3d 704, 715 n. 10 (5th Cir. 2002) (indicating that apportionment under § 85-5-7 "only applies to damages incurred due to negligence" but not to damages based on breach of contract).

No. 07-60379

err in concluding that E&Y failed to provide the necessary expert testimony to establish Travelers' negligence.   Finally, Mississippi law does not require apportionment of fault to a plaintiff absent evidence sufficient to show, at least, negligence on the plaintiff's part.   Accordingly, the district court did not abuse its discretion in denying E&Y's request for an instruction and verdict form that would have allowed apportionment of fault to Travelers.   A new trial is unwarranted on this ground.

V

For the foregoing reasons, we AFFIRM the district court's denial of E&Y's motions for new trial and judgment as a matter of law.

JO.9939109v1

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

**BILL OF COSTS**

U.S. COURT OF APPEALS

FILED

SEP 15 2008

CHARLES R. FULBRUGE III
CLERK

RECEIVED
U.S. COURT OF APPEAL
NEW ORLEANS
SEP 15 2008

| Travelers Casualty and Surety Co. of America, Appellee | v. | Ernst & Young LLP, Appellant | No. | 07-60379 |

**NOTE:** The Bill of Costs is due in this office *within 14 days from the date of the opinion.* See FED. R. APP. P. & 5TH CIR.R. 39. Untimely bills of costs must be accompanied by a separate motion to file out of time, which the court may deny.

The Clerk is requested to tax the following costs against: _____ Ernst & Young LLP, Appellant

| COSTS TAXABLE UNDER Fed. R. App. P. & 5ᵗʰ Cir. R. 39 | REQUESTED | | | | ALLOWED (If different from amount requested) | | | |
|---|---|---|---|---|---|---|---|---|
| | No. of Copies | Pages Per Copy | Cost per Page* | Total Cost | No. of Documents | Pages per Document | Cost per Page* | Total Cost |
| Docket Fee ($450.00) | | | | | | | | |
| Appendix or Record Excerpts | 10 | 62 | $0.15 | $93.00 | 10 | 62 | .15 | 93.00 |
| Appellant's Brief | | | | | | | | |
| Appellee's Brief | 16* | 75 | $0.15 | $180.00 | 15 | 73 | .15 | 164.25 |
| Appellant's Reply Brief | | | | | | | | |
| Other: Binding ($1.50/copy) - $39.00 | | | | $39.00 | 25 | | 1.50 | 37.50 |
| | | | Total $ | $312.00 | | | | |

* Seven copies for the Court, 8 copies for the Certificate of Service (2 copies for each) and one copy for Appellee.

Costs are hereby taxed in the amount of $ _294.75_ this _30th_

Costs are taxed in the amount of $ _294.75_

day of _September_, 2008.

By _____

CHARLES R. FULBRUGE III, CLERK

Deputy Clerk

State of  __Mississippi__

County of __Hinds__

I, _____ do hereby swear under penalty of perjury that the services for which fees have been charged were incurred in this action and that the services for which fees have been charged were actually and necessarily performed. A copy of this Bill of Costs was this day mailed to opposing counsel, with postage fully prepaid thereon. This ___10th___ day of ___September___, ___2008___.

_____
(Signature)

Attorney for __Travelers Casualty and Surety Co. of America, Appellee__

*SEE REVERSE SIDE FOR RULES
GOVERNING TAXATION OF COSTS

JO.993910961